252 S.W.2d 97 (1952)
MORRISON
v.
STATE.
No. 21750.
Kansas City Court of Appeals, Missouri.
October 6, 1952.
*98 Hayden C. Covington, Brooklyn, N. Y., Luther W. Adamson, Kansas City, for appellant.
Horace Warren Kimbrell, Hilary A. Bush, Kansas City, for respondent.
SPERRY, Commissioner.
This is an appeal from an order and judgment of the Juvenile Court. Upon complaint filed by the chief probation officer, Janet Lynn Morrison, a female infant, 12 days of age was, by the court, found to be a neglected child within the meaning of our statutes, Sections 211.010, 211.300, RSMo 1949, V.A.M.S. The medical evidence established that she was suffering from a dangerous malady of the blood for which there is no known remedy except blood transfusions, to the giving of which her parents refused consent. She was adjudged to be a ward of the court and it was ordered that blood transfusions be administered. The child's father prosecutes this appeal.
The cause was heard on the same day the complaint was filed. The father of the child was in court and gave testimony. He was also represented by able counsel. Although the hearing was summary in its nature, no complaint is lodged on that score. Indeed, the urgent need for prompt action, necessary to save the infant's life, permitted of no legal quibbling or unnecessary delay, according to the medical testimony adduced.
The undisputed testimony, offered by the state in support of the complaint, came from two witnesses" Esther Winkelman, a highly qualified medical doctor, graduate of Kansas University Medical School, of fifteen years experience in the practice of her profession and a member of the staff of three reputable hospitals in this community, who delivered the child and attended her; and Rebecca Henion, medical technician of Research Hospital. Hospital records of *99 laboratory blood tests of the child, from the date of birth on October 8, 1951, until date of trial, October 20, 1951, were introduced into the record.
Dr. Winkelman's testimony was to the effect that she was employed by the child's parents to attend the birth; that delivery was attended with some difficulty but that the child was in good condition; that, after the first day, she developed symptoms of erythroblastic anemia; that there was extreme jaundice and the white count grew progressively lower every day; that this indicates destruction of the red blood cells; that the hemoglobin, on the day of trial, was 30% and the red count was 1,100,000; that this condition indicates that the illness is progressing very rapidly; that if life was to be saved, the baby should have an immediate blood transfusion; that she had notified the parents of this critical situation, and of the need of the above operation, six days prior to the date of hearing; that the parents refused to give their consent thereto, stating that the giving of blood transfusions is contrary to their religious belief and convictions; that she again urged the necessity of the operation on the day prior to trial, telling the father that the child's condition was grave. She stated: "The child will most certainly die if a transfusion is not done"; that death would probably occur within a week unless a transfusion was given; that if done immediately recovery would be complete; if done a few days later, life might be saved but that the destruction of brain tissue might result in leaving her mentally defective; that life was in danger and a blood transfusion was the only remedy. On cross-examination, she gave the names of four other doctors, qualified in this field of medicine and practicing in this community, with whom she had consulted relative to the child's condition. She stated that each gave it as his opinion that blood transfusion is the only remedy for the child's condition.
Rebecca Henion stated that she had done, or supervised, all laboratory work on the baby since its birth; that it showed every sign of erythroblastic anemia and grew progressively worse, day by day; that a transfusion should have been given on the 13th, when the condition was discovered; that the hemoglobin count on the day of trial was 30%, which is considered to be about the fatal percent; that the procedure at Research Hospital is to transfuse all erythroblastic anemia patients; that the disease follows one of two courses, towit: it either grows progressively worse or progressively better, over a period of time; that transfusions will not be given, at Research Hospital, except with the consent of the parent; that never before, within her experience of eight years, had parents refused consent for a transfusion in such a case.
She identified the laboratory records, which bore out her testimony concerning the blood tests.
Appellant testified to the effect that he was a conservant (minister) of a religious sect known as "Jehovah's Witnesses"; that he had been informed of the seriousness of the illness from which the baby suffered and was advised by Dr. Winkelman of the necessity for a blood transfusion; that he refused to give consent to the operation; that he based his refusal to give consent on certain Biblical commandments, among them being the following: "If anyone at all belonging to the house of Israel or the proselytes who reside among them eats any blood at all, against the person who eats blood I will set my face, and I will cut him off from his people; the life of every creature is identical with its blood." Leviticus 17:10-14, American Translation. He stated that this law is older than the Israelite Nation, because God said to Noah, after the flood: "But flesh with the life thereof, which is the blood thereof, shall ye not eat. And surely your blood, the blood of your lives, will I require; at the hand of every beast will I require it, and at the hand of man; even at the hand of every man's brother will I require the life of man." Genesis 9:4, 5.
It is noted that, immediately following the first above quoted passage of scripture, there follows an admonition against the eating of the flesh of a creature which died "of itself," or whose flesh was "torn by beasts." With the interpretation of *100 these Biblical injunctions we are not concerned. Courts leave such matters to the conscience of the people. This case is one instituted by the State on the authority of a statute, the provisions of which are in complete harmony with the applicable principles of the common law. See Black-stone, Book 1, Section 447.
No attack is made on the sufficiency of the complaint; and it is sufficient. State v. Farrell, Mo.App., 237 S.W.2d, 493, 495.
Appellant contends that this case is not moot and dedicates a substantial portion of his brief to that proposition. Respondent does not insist on a ruling on that point, but comments on the fact that the question of whether the case is moot does appear on the face of the record. Because the issue is waived by respondent we shall not discuss it at length. In a very recent case, involving identical issues to those here presented, the State seriously contended that the appeal should be dismissed on the grounds that the case was moot. The Illinois Supreme Court said that, because the issue presented was of substantial public interest and that it was desirable that an authoritative determination be made for the future guidance of public officers in probably recurring cases, appeal should not be dismissed. Another reason given by that court for refusal to dismiss was that an appellate decision would tend to clarify the rights of parties involved in the event a damage suit should be brought, based upon the fact that the operation was performed without the consent of the parents. People ex rel. Wallace v. Labrenz, 411 111. 618, 104 N.E.2d 769, 772, 773. On the above decision, and the authorities there cited, we hold that the appeal should not be dismissed.
Appellant, in his brief, vigorously urges that his rights, as guaranteed by the State and Federal Constitution, have been unlawfully invaded because the order complained of violates his right of religious freedom. No such question was raised or presented in the trial court at any time. That being true, the general rule is that it cannot be presented on appeal. Lieber v. Heil, 325 Mo. 1148, 30 S.W.2d 143. To that rule there is an exception, namely: Where, on the whole case, some provision of the constitution was either directly or by inexorable implication involved in the rendition of the judgment and decided against appellant. Lohmeyer v. St. Louis Cordage Company, 214, Mo. 685, 690, 113 S.W. 1108. That exception is not applicable here.
In the case at bar the question presented is: Does the State have the power, under the above-mentioned statute, to take the custody of an infant child from its parents for the purpose of preserving its life? The question of the right of religious freedom of appellant is in no sense involved. This proceeding in no wise affects the right of appellant to believe, religiously, as he professes to believe, nor does it affect his right to practice his religious belief. It was not ordered that he eat blood, or that he cease to believe that the taking of blood, intravenously, is equivalent to the eating of blood. It is only ordered that he may not prevent another person, a citizen of our country, from receiving medical attention necessary to preserve her life.
The U. S. Supreme Court has held that the regulation, or suppression, of religious practices, is not an invasion of religious belief and opinion, Reynolds v. United States, 98 U.S. 145, 166, 25 L.Ed. 244; and in Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 167, 168, 170, 64 S.Ct. 438, 442, 88 L.Ed. 645, it was said: "The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. * * * A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, * * *. Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice themselves." If a constitutional question were properly raised, or inhered in the case, the Supreme Court of the United States has already ruled that the statute here under consideration is well within the power of the State to enact and constitutionally sound, and the statutes *101 from which our present code concerning' neglected, dependent, and delinquent children are derived, have been said held constitutional by our Supreme Court. State ex rel. Matacia v. Buckner, 300 Mo. 359, 365, 254 S.W. 179; Vernon's Annotated Missouri Statutes, Vol. 12, page 500, Historical Note.
Appellant contends that the court lacked jurisdiction, under the statute, to render the judgment that it entered, and that no such power existed at common law, exclusive of the statute. He insists that the relationship of parent and child is sacred, that a parent derives his authority from the natural law; and that it may not be interfered with by the State, even in a case where the child is in need of medical attention, even though its very life may depend upon such interference. His position is that a child cannot be "neglected" within the meaning of the statute merely because its parents fail to provide medical attention. He maintains this attitude in the face of the undisputed medical evidence in this case that, without a blood transfusion, the child would surely die.
Speaking of natural law Aristotle, many centuries ago, said: "When several villages are united in a single complete community, large enough to be nearly or quite self-sufficing, the state comes into existence, originating in the bare needs of life, and continuing in existence for the sake of a good life. And therefore, if the earlier forms of society are natural, so is the state, for it is the end of them, and the nature of a thing is its end. For what each thing is when fully developed, we call its nature, whether we are speaking of a man, a horse, or a family. Besides, the final cause and end of a thing is the best, and to be self-sufficing is the end and the best.
"Hence it is evident that the state is a creation of nature, and that man is by nature a political animal. And he who by nature and not by mere accident is without a state, is either a bad man or above humanity, he is like the Tribeless, lawless, heartless one,' whom Homer denounces the natural outcast is forthwith a lover of war; he may be compared to an isolated piece of draughts. * * *
"Further, the state is by nature clearly prior [1] to the family and to the individual, since the whole is of necessity prior to the part; * * * The proof that the state is a creation of nature and prior to the individual is that the individual, when isolated, is not self-sufficing; and therefore he is like a part in relation to the whole. But he who is to live in society, or who has no need because he is sufficient for himself, must be either a beast or a god; he is no part of a state. A social instinct is implanted in all men by nature, and yet he who first founded the state was the greatest of benefactors. For man when perfected, is the best of animals, but, when separated from law and justice, he is the worst of all; * * *
There is a passage in America's most revered document, with which every American school child should be familiar, towit: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, governments are instituted among Men, * * *." Declaration of Independence.
Inalienable is defined as incapable of being surrendered or transferred; at least without one's consent. Webster's New Int. Dictionary, Second Ed. Vol. 2, page 1254.
The Declaration is regarded by the American people as expressing their views of the fundamental purpose of Government. We believe that every human being is endowed by God with the inalienable right to live. The fact that the subject is the infant child of a parent who, arbitrarily, puts his own theological belief higher than his duty to preserve the life of his child cannot prevail over the considered judgment of an entire people, in a case such as this. The other rights, liberty and the pursuit *102 of happiness, are of no benefit to a dead baby. Unless we are to say, in effect, that the "Immortal Document" consists of a collection of beautiful sounding platitudes and meaningless phrases, " * * * as sounding brass, or a tinkling cymbal," Missouri has the power to interfere in the interests of one of its infant citizens, helpless in its own behalf, and to take such steps as may be necessary to preserve its life, over the protest of its father.
Blackstone, in Book 1, Section 447, (published 1765) said: "The duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation, says Puffendorf, laid on them not only by nature herself, but by their own proper act, in bringing them into the world; for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have the perfect right of receiving maintenance from the parents." (Italics ours). It follows that society may punish a parent for dereliction in his duties; but society is not required to stand aside until the child is dead for want of care, but may take direct steps to preserve the life that the parents neglected to cherish.
Courts of equity, in Missouri, have traditionally exercised their power to safeguard and protect the personal rights of infants; and a child becomes a ward of the court when brought before it for any purpose. In re Badger, 286 Mo. 139, 145, et seq., 226 S.W. 936, 14 A.L.R. 286. In the above case it was said that the paramount right of a father to the custody of his child need not be considered if the welfare of the child is at stake, for his right is not absolute. That equitable jurisdiction was codified in the statutes relating to neglected and dependent children. People v. Labrenz, 411 111. 618, 104 N.E.2d 769, 773.
In ancient Times the King was regarded as "Parens Patriae" of orphaned or dependent infants. 27 Am.Juris, pages, 222, 223. Under our system of government the state succeeds to the position and power of the King. Both King and State exercise this power in the interests of the people. Society has a deep interest in the preservation of the race itself. It is a natural instinct that lives of infants be preserved. That instinct in beasts manifests itself when the wild herd, heads lowered, oblivious of danger, charges a wolf pack attempting to carry off a calf.
Appellant cites and relies on In re Hudson, 13 Wash.2d 673, 126 P.2d 765, 771-775, where the court reversed a judgment ordering an operation on an infant child, in the face of overwhelming evidence to the effect that, without such an operation, the child would be handicapped and dependent all of her life. The only real difference, in principle, between that case and this, is that in the Hudson case the operation was extremely dangerous to life, whereas the giving of a blood transfusion is attended with a minimum of danger. However, the Washington court bottomed its decision on the theory that the State had no power to order medical treatment for an infant against the wishes of its parents. Where the proposed treatment is dangerous to life, or there is a difference of medical opinion as to the efficacy of a proposed treatment, or where medical opinion differs as to which of two or more suggested remedies should be followed, requiring the exercise of a sound discretion, the opinion of the parent should not be lightly overridden. Such is not the situation here. Appellant would do nothing himself, nor would he consent that others should do anything. The Hudson decision was by a divided court: three judges concurring, one concurring in the result, and three vigorously dissenting. The dissenting opinion is forceful and well reasoned. We decline to follow that decision.
In Mitchell v. Davis, Tex.Civ.App., 205 S.W.2d 812, it was held, by the Texas Civil Court of Appeals, that failure on the part of a parent to provide a boy of twelve years with suitable and proper medical attention for a serious arthritic condition, (prayer and home remedies were being relied *103 on) was sufficient evidence of neglect as to authorize the State to take custody and provide such medical care as was required. The court said, 205 S.W.2d loc. cit. 813:
"Medicines, medical treatment and attention, are in a like category with food, clothing, lodging and education as necessaries from parent to child, for which the former is held legally responsible. 23 Tex.Jur. 719; and proof that the parent is failing to provide any of these legal necessities to minor constitutents of the family would, in our opinion, sustain a charge of parental neglect. `It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation, including medical attendance, if necessary. An omission to do this is a public wrong which the state, under its police powers, may prevent.' 39 Am.Jur., sec. 46, p. 669."
In a recent decision by the Supreme Court of 111., People v. Labrenz, supra, a judgment of the Juvenile Court ordering a blood transfusion, over the objection of the parents of an infant suffering from erythroblastic anemia, was sustained. The parents, as in the case at bar, were Jehovah's Witnesses, and they refused to give consent to the operation. They based their objections to the giving of a transfusion on the same scriptural passages as does appellant. The court distinguished In re Hudson, supra, on the grounds that, in the latter case, the proposed operation involved substantial risk of life whereas the court said, a blood transfusion was virtually certain of success if given in time and would be attended by no risk greater than such as are inescapable in all of the affairs of life.
A religious zealot may have the right to fast until death in the sincere belief that, by so doing, God will be influenced to act positively on behalf of a sinful world; but he may not be permitted to abuse his parental authority by denying his children food, freely offered by a compassionate society to relieve their suffering and preserve their lives and mental and physical health. Such a doctrine may be upheld on the theory that society's loss of such an adult is slight, however, self murder is a crime, Section 559.080 RSMo 1949, V.A.M.S., but that the loss of the lives of its youth, who constitute the hope of racial survival and progress, is of vital concern to the very life of the nation. Appellant virtually concedes that the State may act in cases where food is denied to an infant child. In this case medical attention was just as necessary for the child's survival as was food; and we hold that the State had the power to act in order to preserve the child's life and health.
The judgment should be affirmed. BOUR, C., concurs.
PER CURIAM.
The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed.
All concur.
NOTES
[1] "Note that Aristotle uses the term `prior' not, to designate a time relationship but rather to designate a relationship of value or dependence." Aristotle's Basic Works, McKeon, 1941, pages 1129-1130.