497 S.W.2d 831 (1973)
In re C____ F____ B____, a minor.
No. KCD26137.
Missouri Court of Appeals, Kansas City District.
June 4, 1973.
Motion for Rehearing and/or Transfer Denied June 26, 1973.
*832 Warren D. Weinstein, Columbia, for respondent Juvenile Officer.
Darwin A. Hindman, Jr., and Richard A. Poe, Columbia, for appellants, Parents.
T. E. Lauer, St. Louis, and Wendy W. Schiller, Clayton, National Juvenile Law Center of St. Louis, for Child.
Before WASSERSTROM, P. J., and SHANGLER and SWOFFORD, JJ.
WASSERSTROM, Judge.
This case presents the issue as to whether the withdrawal of a minor child by her parents from a program of psychiatric evaluation and treatment, contrary to medical advice, constitutes "neglect" within the meaning of § 211.031 RSMo 1969, V.A.M. S. From a finding adverse to them, the parents appeal. The National Juvenile Law Center was appointed to represent the child for purposes of this appeal, and lawyers associated with that organization have earned the gratitude of this court for their thorough and thoughtful presentation on behalf of the minor.
At the commencement of the events about to be narrated, the child C____ F____ B____ was five years of age. This little girl is above normal in intelligence but gave evidence of excitable behavior to the extent that the mother consulted with a pediatrician, Dr. Harris, in May, 1970, concerning her condition. Dr. Harris diagnosed the child's condition as hyperactivity and he recommended that the child be given special treatment.
In accordance with that recommendation the mother enrolled the child in Community Nursing School. However, after a relatively short period she was withdrawn from that program. Thereafter, during the spring of 1971 the mother enrolled the girl in a special Summer Program conducted *833 by the public school authorities. Participation in this program was interrupted when C____ F____ B____ was accepted as a voluntary out-patient at Mid-Missouri Mental Health Center, pursuant to an application which had been initiated by Dr. Harris in April, 1971.
The child did commence a "day care" program at the Mental Health Center on September 8 and continued until October 6, 1971, except for brief interruptions which the mother explained as having been occasioned by childhood ailments. However, on October 6, 1971, the mother withdrew the child from the Mental Health Center. The reasons given by her were that the Center had failed to give the child any "calming agents" (presumably some form of tranquilizer); that no reports were being given by the Mental Health Center to her, the mother, or to Dr. Harris; and that the child was beginning to have nightmares, had begun bedwetting and was beginning to use bad language and display tantrums. The mother in her court testimony also complained of the manner in which she had been treated by members of the staff. When the mother announced her intention to withdraw C____ F____ B____, the staff protested and one of the staff told her "you are going to be very sorry, Mrs. B____, very, very sorry if you take C____ out".
Notwithstanding that warning, the mother did carry through the withdrawal and on October 25, 1971, enrolled her daughter in another school known as Community Learning Center. The child was only there for two days because on October 26 staff members of the Mental Health Center took steps for the issuance of a petition in the Juvenile Court having for its purpose the taking of the child from the custody of her parents and having her returned to the Mental Health Center. During the very brief period that the girl had been at the Community Learning Center, it became apparent that this school was not equipped to handle her condition, but at the time she was picked up under the order of the Juvenile Court on October 27, 1971, arrangements had been made for her to be seen by Dr. Harris, who was in turn, to refer her to a private psychiatrist.
The order of the Juvenile Court for the taking of the girl into custody had been issued on the affidavit of staff members of the Mental Health Center and without any notice to the parents or hearing. After custody of the child was so taken from the parents, they filed a motion for return of the child to them pending a hearing on the merits. A hearing was held on this motion, after which the motion was overruled. Thereafter, on November 22, 1971, a hearing was held on the merits. The Juvenile Court made a finding that the child had been neglected in that the "child is in need of psychological, emotional or medical evaluation for condition of hyperactivity; that parents are neither providing nor permitting adequate evaluation, diagnosis or treatment; and that said child is therefore within purview of § 211.031, RSMo, V.A. M.S." The court ordered that the child be made a "ward of the Court and remanded to the custody of natural parents on condition that child attends school at Mid-Missouri Mental Health Center until further order of Court."
Several months later on April 24, 1972, the Mental Health Center filed with the Juvenile Court a follow-up re-evaluation of the child. In response to the recommendations contained in that report, the court on April 26, 1972 modified its order as follows:
"Child continued in the custody of natural parents on condition that child attend Transition Class operated by Mid-Missouri Mental Health Center and Columbia School District.
"It is further ordered that natural mother refrain from entering the school building wherein said transition class is conducted or from contacting in person or otherwise any teacher or official thereof except at request of a teacher or official thereof."
*834 The parents make the following challenges to the actions of the Juvenile Court, in which objections counsel for the child join: (1) that the order of October 26, 1971, taking custody from the parents was void because made without an opportunity for hearing and without a sufficient showing of any immediate necessity affecting the child; (2) that the court erred in refusing to return the child to the parents on their motion pending a hearing on the merits of the case, because the evidence produced at the hearing on the motion was insufficient to show any exigent circumstances requiring that the child be taken into the immediate custody of the court; and (3) that the court erred in exercising jurisdiction after hearing on the merits, for the reason that the evidence did not show any neglect on the part of the parents.
The Juvenile Officer objects to any consideration of Points (1) and (2) on the ground that a final hearing on the merits has already been held, that this court can no longer grant any relief with respect to those challenges, and that those issues have therefore become moot. The parents and the child rejoin that this court should nevertheless proceed to hear and rule those issues, because the problem is a recurrent one in the administration of juvenile laws of this State and the public officials charged with the administration of those laws should have the benefit of a ruling on these matters of law which have not heretofore been decided by any appellate court of this State. The parents and the child cite the following cases which hold that issues will be ruled despite the objection of mootness where there is present a significant public interest: Boone v. Danforth, 463 S.W.2d 825 (Mo. banc 1971); Morley v. Ryan, 461 S.W.2d 7 (Mo.1970); Morrison v. State, 252 S.W.2d 97 (Mo.App. 1952); Triplett v. Grundy Electric Cooperative, Inc., 389 S.W.2d 401 (Mo.App.1965).
However, the application of the exception set forth in those cases is discretionary with the court. 5 Am.Jur.2d, Appeal and Error, § 768, p. 210-211. In this case, a proper exercise of discretion does not call for the application of this exception. If the issues in question are as recurrent as counsel represents, then these issues can be presented in live form in another case by means of habeas corpus. Presentation in that form will have the very distinct advantage, if none other, of permitting this court to consider all aspects of the procedural issues involved, which cannot be done on this appeal. On this direct appeal, this court is without jurisdiction to pass on the constitutional arguments which have been briefed extensively by counsel. Although this court does not have that jurisdiction on direct appeal, it would have jurisdiction to consider those same arguments if and when presented in a habeas corpus proceeding. Barrett v. Barrett, 79 S.W.2d 506, l. c. 508 (Mo.App. 1935); State ex rel. Coffman v. Crain, 308 S.W.2d 451, l. c. 454 (Mo.App.1958).
Passing therefore the first and second assignments of error, we turn now to the third assignment which presents the central issue of this case: whether the parents were guilty of "neglect" so as to give the Juvenile Court jurisdiction under § 211.031. This statutory prerequisite to jurisdiction is not a term having a fixed and rigid meaning. As stated by Judge Tamilia in "Neglect Proceedings and the Conflict between Law and Social Work", 9 Duquesne L.Rev. 579, l. c. 584: "Neglect, as a concept, permits of no certainty, and protection from vagueness must be found in the wisdom of judges rather than the detail of statute." See also, In re C____, 468 S.W.2d 689, l. c. 693 (Mo. App.1971); 47 Am.Jur.2d, Juvenile Courts and Delinquent and Dependent Children, § 24, p. 1003. Certainly, the concept of "neglect" does cover a situation where a parent fails and refuses to offer a child necessary medical attention. Morrison v. State, 252 S.W.2d 97, l. c. 102 (Mo.App.1952); Annotation "Power of Public Authorities to Order Medical Care for Child over *835 Objection of Parent or Custodian", 30 A. L.R.2d 1138. This extends to requiring the parent to afford the child treatment for mental and emotional ills, 42 Am.Jur.2d, Infants, § 16, p. 21-22.
The difficulty of applying these general rules in specific cases lies in reconciling the needs of the child with the rights and privileges of parents and of both with the interest of the state in safeguarding children upon whom its entire future depends. The perplexities of arriving at a fair balance of these sometimes conflicting factors has been remarked by authorities in the field, such as Professor Paulsen, who speaks in "The Delinquency, Neglect, and Dependency Jurisdiction of the Juvenile Court," in Rosenheim, ed. Justice for the Child (1962), at p. 68, of the court being called upon not only to interpret the statutory language but also to give its "estimate of the human situation." See also "Child Neglect: Due Process for the Parent," 70 Columbia L.Rev. 465 (1970).
The highly debatable questions of judgment involved are illustrated by the case of In re Seiferth, 309 N.Y. 80, 127 N.E.2d 820 (1955), where the court divided 4 to 3 on the issue of whether a father was guilty of neglect in refusing to consent to surgery for the purpose of repairing his son's harelip and cleft palate.
This is not a class of case where the answer can be found by searching for legal precedent. Nor will it do to attempt to deduce a syllogistic conclusion from platitudinous premises. Rather, the solution must rest upon an analysis of the individualized facts of each special case.
Turning, therefore, to a consideration of the particular situation here, the starting point is the undisputed fact that this minor child does need psychiatric help. All parties agree as to that. True, the mother did withdraw the child from the psychiatric treatment which was being given until October 6, 1971. However, that withdrawal cannot be interpreted as an expression of denial by the mother of the need for psychiatric treatment nor a refusal on her part to allow that treatment to be given. All that the mother's withdrawal meant was that she was dissatisfied with the treatment being given by and the attitudes of the Mid-Missouri Mental Health Center.
Whether the mother's reasons for that dissatisfaction were correct or incorrect is not the point. The mother had a right to choose between different doctors or institutions for the purpose of this type of care. So long as the mother was willing and intended to provide appropriate care in some manner, no finding can stand that she was guilty of neglecting the child.
That the mother was willing, and indeed anxious, for psychiatric care to her daughter cannot be doubted. The mother testified at the hearing in this respect as follows: "I know she needs some other kind of help besides just a pediatrician, and I want it taken care of before she gets any older so that she can live a normal life later on." This statement on the part of the mother is borne out by the actions which she actually took. Thus, the only reason the child came to be in the Mental Health Center altogether was because of the active seeking of such help by the mother and her voluntary consent to the program which had been undertaken in September. Prior to that admission, she had sought help from Dr. Harris, Community Nursing School, and the public school special Summer Program. Moreover, when the child was withdrawn from the Mental Health Center, the mother immediately sought other substitute care and placed the child in the Community Learning Center. At the very time when the child was picked up and taken into custody under order of the Juvenile Court, an appointment had been arranged for the child to be sent to a private psychiatrist through referral by Dr. Harris.
Substantial doubt may be entertained as to whether the mother's desire for private treatment to her daughter represented a realistic *836 plan. The record shows that this family is in very modest circumstances, and the ability by the parents to finance private psychiatric treatment is seriously questionable. Nevertheless, no one can say in advance that this is impossible. Furthermore, had the mother been permitted to pursue this possibility and if the cost had thereupon been shown to be prohibitive, then she would in all probability have returned voluntarily to the public facilities open at the Mid-Missouri Mental Health Center. No one questions that the mother here is devoted to her daughter and is making strenuous efforts for the welfare of the child. Obviously, it would have been a far better situation in all respects had the mother been permitted to exhaust all alternative possibilities and be given a chance to convince herself to return the child to the Mental Health Center voluntarily, rather than to resort immediately to the use of legal force in the manner followed here.
The major thrust of the Juvenile Officer's argument in this case seems to be that the mother is the dominant parent with regard to making choices on behalf of the child, and that the mother is the victim of mental disturbance herself, for which reason her choice should not be given effect. This was a major point in the affidavit originally submitted to the Juvenile Court in behalf of the application for taking custody from the parents. In that affidavit the Mental Health Center staff stated that the mother "has a tenuous touch with reality at best" and "probably has a thought disorder." However, that intimation did not stand closer scrutiny. For example, in the subsequent psychiatric evaluation submitted to the court by one of the Mental Health Center psychiatrists, he states that Mrs. B____ "is not a bad mother and most probably supplies all of the needs, including love, that these children need * * *. Again, I repeat that I think that Mrs. B____ is well able to provide for her family, is not afraid to seek and demand help from agencies, organizations, people, etc., that she is a conscientious, supportive, and deeply loving mother * * *". Moreover, after the charges had been made against her mental and emotional stability as set forth in the affidavit submitted to the Juvenile Court, the mother voluntarily submitted herself for psychiatric evaluation by a private psychiatrist, Dr. Tom Anderson. On the basis of his interviews with the mother, he testified:
"* * * from the evaluation that I did I felt that she is capable of taking care of her child.
Q Do you feel that she is capable of making, with respect to values, necessary for taking care of her child?
A Yes, I do.
Q And with respect to providing her an education?
A Yes, sir.
Q She is mentally able to make reasonable values necessary?
A Yes, sir.
Q Do you think this was a reasonable degree of medical certainty, and this is your opinion?
A Yes, this is a legal term, but I think I understand what you mean. I think I can say yes."
The real basis for the complaints against the mother on the basis of the entire record appears to be that she is a very strong-willed person who had an abrasive effect upon the Mental Health Center staff. This appears particularly from the testimony of Dr. Harris who had worked for considerable time with the mother in his capacity as pediatrician for the child. Dr. Harris testified: "When Mrs. B____ is handled in a satisfactory manner, she has always followed my advice. *837 She is a special person that requires some consideration of her feelings and a different approach to her * * * I believe there should be an attempt by the whole staff at Mid-Missouri to work with her parents incorporation [sic] with the child."
The ultimate question in this case comes down to whether state employed professionals shall be permitted to substitute their judgment for that of the parents. No sanction for that type of substitution is granted by the law, unless there is neglect on the part of the parents. No neglect is shown on the facts of this case. "Neglect" for this purpose must be understood as a failure by the parents to supply the minimum quality of care which the community will tolerate. Tamilia "Neglect Proceedings and the Conflict between Law and Social Work", 9 Duquesne 579, l. c. 586; Paulsen "The Delinquency, Neglect and Dependency Jurisdiction of the Juvenile Court", Rosenheim ed. "Justice for the Child", p. 74; In re C____, 468 S.W.2d 689, l. c. 693 (Mo.App.1971). The action of the parents here falls far short of condemnation under that standard.
From this record, it is perfectly clear that the minor child needs psychiatric help, and she is fortunate to have been offered state assistance. Although there is no legal basis now upon which to force the parents to accept that help so offered by the Mental Health Center, it is to be hoped that they will realize the special opportunity which has been made available to their daughter and which unfortunately because of financial reasons cannot be extended to all children who need this expensive type of service. At the same time, it is also to be hoped that the doubtlessly overworked staff of the Mental Health Center will take heed of the suggestions by Dr. Harris and will endeavor to exercise increased sensitivity to the mother's need for compassionate understanding.
The judgment is reversed.
All concur.