In the Interest of E.J., a minor under age seventeen.

No. 52833.

Missouri Court of Appeals, Eastern District, Division One.

Dec. 29, 1987.

Briscoe, Hardcastle & West, Michael Hardcastle, St. Louis, for appellant.

Patrick J. Connaghan, St. Louis, for respondent.

CRIST, Judge.

Appellant (mother) seeks review of a judgment of the Circuit Court of the City of St. Louis, Juvenile Division, taking jurisdiction over her baby daughter E.J. and placing her in the custody of the Division of Family Services pursuant to § 211.031.1(1), RSMo 1986. We affirm.

■ For the benefit of mother's attorney, we note that mother's one-page "statement of facts" gives us the date of E.J.'s birth, and the dates of various official proceedings. Nothing about the child's condition, or the evidence presented in the trial court was included in this section. It is not the fair and concise statement of facts required by Rule 84.04(c); *Thummel v. King,* 570 S.W.2d 679 (Mo. banc 1978); *Riggs v. Rohrer,* 680 S.W.2d 432, 433–34 (Mo.App. 1984). Her point relied on is no better. "Whether the trial court's finding of child abuse and assertion of jurisdiction was sup-

ported by sufficient evidence adduced at trial," does not apprise us of the court's ruling or wherein and why the trial court erred. Rule 84.04(d); *Thummel,* 570 S.W. 2d at 686; *Riggs,* 680 S.W.2d at 433. Mother's brief justifies a dismissal of her appeal; however, because the welfare and custody of a brain damaged infant is at issue, we will deal with her substantive argument.

E.J. was born on August 1, 1986, in a fatherless environment. She lived with her mother, aunt, grandmother, great grandfather, and infant cousin. She was cared for by all the adults in the household. Mother's boyfriend visited frequently and sometimes took care of E.J.

On October 21, 1986, E.J., then two months and twenty-one days old, was admitted to St. Louis Children's Hospital. She was diagnosed as suffering from chronic bilateral subdural hematoma, left frontal lobe brain contusions, right frontal depressed skull fracture, and bilateral acute retinal hemorrhages. As a result of these injuries, E.J. has permanent brain damage.

Dr. Abramson, a pediatric neuro-radiologist, testified as to E.J.'s injuries and their probable causes. The bilateral retinal hemorrhages were indicative of what has been called the Shaken Child's Snydrome; however, the frontal skull fracture could have only been caused by a lot of force, such as from a fall or the impact of a blunt instrument on the front of the child's skull. He further testified although the fracture occurred twenty-four to forty-eight hours before E.J. was admitted to the hospital, the subdural hematomas were three to five weeks old by that time. These injuries could not have been self-inflicted by a three-month-old child. In the opinion of several of E.J.'s physicians, the injuries were the result of child abuse. An abuse hotline report was made because of the injuries present on her admission to children's hospital.

On October 31, 1986, the juvenile officer got an order authorizing the detention of

E.J. Subsequently, the juvenile court made a finding that there was probable cause to believe it had jurisdiction under § 211.031, RSMo 1986. A hearing to determine custody was held January 22, 1987. At that hearing, mother, grandmother, aunt and mother's boyfriend testified they were E.J.'s caretakers and none of them had any knowledge as to how she was injured. After the hearing on jurisdiction, the juvenile court found jurisdiction because E.J. was without proper care, custody or support, in that: (1) she was severely injured; and (2) the injuries were not self-inflicted or accidentally suffered, but rather were the result of child abuse. Immediately thereafter, the juvenile court held a hearing on the disposition of E.J. The responsibility for her care, custody and control was placed in the Division of Family Services.

Mother argues there was no child abuse because "abuse" is defined as "any physical injury ... inflicted on a child other than by accidental means by those responsible for [her] care, ...." § 210.110(1), and there is no evidence as to the exact cause of E.J.'s injuries. There is no evidence E.J. was intentionally injured by those responsible for her care, but we do know she suffered serious injuries while in the care, custody and control of her mother; and that those injuries could not have been self-inflicted. We also know her caretakers profess to having no idea how her injuries occurred, and it is to this same environment that mother wants us to return E.J.

The juvenile court has jurisdiction when there is clear and convincing evidence the child is in need of care. *K.H. v. Long,* 652 S.W.2d 166, 167[1] (Mo.App.1983). The court does not have to find a dangerous situation exists, *Id.,* only that there is a failure to supply the minimum quality of care which the community will tolerate. *In re C____F____B____,* 497 S.W.2d 831, 837[6] (Mo.App.1973). The injuries inflicted upon three-month-old E.J. combined with the "I don't know" attitude of her caretakers make her a child in need of care.

Mother asserts there was evidence of only one isolated injury, and that such evidence does not prove she failed to provide E.J.'s necessary care. In support of her argument she relies on *In Interest of S.B.,* 712 S.W.2d 18 (Mo.App.1986). In that case we reversed a finding of neglect because there was "[n]o other evidence even remotely intimat[ing] the absence of concerned parenting...." *Id.* at 19. Dr. Abramson testified to injuries caused during two different time frames and to two different sources of the injuries. Even in a light most favorable to mother, there were two or three occasions when E.J. was not properly cared for; this is not a case of one isolated accident.

The juvenile code permits action to prevent the deterioration of a child's situation. *In Interest of C.L.M.,* 625 S.W.2d 613, 616 (Mo.banc 1981). There was no evidence the person responsible for E.J.'s injuries was removed from the environment; in fact mother testified all the same people were still present in the home. Under slightly different circumstances, we have held "the court is not required to 'test' the parents by subjecting the infant child to the potentially harmful environment which the evidence indicates currently exists in their home." *In Interest of J.J.,* 718 S.W.2d 235, 237[2] (Mo.App.1986) (affirming removal of child from parents at birth, prior to their actually having physical custody, where parents were mentally incapable of providing necessary care). The same reasoning applies here.

Our primary concern is the welfare of the child. *In re B.G.S.,* 636 S.W.2d 146, 148[4] (Mo.App.1982). Our preference for parental custody is superseded by concern for the child's welfare. *In Interest of C.L.M.,* 625 S.W.2d at 617[6]. The evidence in this case supports finding the environment in mother's home is injurious to E.J.'s welfare. *L. v. Jackson County Juvenile Court,* 544 S.W.2d 330, 332[3] (Mo.App. 1976).

Judgment affirmed.

GARY M. GAERTNER, P.J., and REINHARD, J., concur.