50 S.W.3d 408 (2001)
In the Interest of G.C., A Minor Child.
No. ED 78712.
Missouri Court of Appeals, Eastern District, Division One.
July 31, 2001.
*409 Richard A. Wunderlich, Jeana D. McFerron, St. Louis, MO, for appellant.
Julie Forman-Jones, Union, MO, Charles Alan Hurth III, (Guardian Ad Litem), Union, MO, for respondents.
MARY R. RUSSELL, Judge.
T.C. ("Mother") appeals from the juvenile court's order and judgment placing her 12-month-old son, G.C. ("Infant"), in the legal custody of the Division of Family Services ("DFS"), which placed Infant in the physical custody of Mother's grandmother. On appeal, Mother contends that the juvenile court erred in entering its order and judgment pursuant to section 211.031.1(1) RSMo 2000[1] because it lacked jurisdiction over Infant. We reverse in that there was not clear and convincing evidence adduced at the hearing for the juvenile court to find Infant was in need of care and treatment.
Mother left Infant at her friend's trailer residence in Franklin County sometime in the early morning hours of April 10, 2000. She did so as she was scheduled to appear in criminal court in St. Louis at 9 a.m. She did not have a car and relied on her friend for transportation. The friend's elderly, blind mother and 12-year-old daughter were to care for Infant during Mother's absence.
While Mother was in court, DFS received an emergency report stating that the 12-year-old caregiver "couldn't take it any longer," "that there wasn't any food in the house, that she had attempted to contact her mother and tell her ... that there was no food in the house and that her mother had instructed her to feed [Infant] cornmeal."
A DFS investigator attempted to contact Mother by calling the emergency numbers that Mother left at the trailer, but her attempts were unsuccessful. The investigator took Infant into protective custody, and was able to contact Mother's grandmother, who picked up Infant and took him into her home.
Mother did not leave the St. Louis courthouse until 6 p.m. At that time, Mother first learned that there was a problem involving Infant. Although she had access to a telephone earlier in the day, she made no attempt to contact Infant's caregivers.[2] She returned to Franklin County over 19 hours after leaving Infant at the trailer.
The next day, the juvenile officer filed a petition alleging that Infant was in such condition or surroundings that his welfare required the court to take immediate custody. A First Amended Petition was filed alleging that Infant was in need of care and treatment under supervision of the court because: Mother was unable to be located at the emergency numbers left at the trailer; Infant was inappropriately left with a 12-year-old and an elderly blind woman, both of whom were incapable of providing proper care; and the trailer was filthy with no sheets on the beds, dirty *410 clothes strewn about, drawers pulled out, and a bag of sexual devices sitting in the corner.
Mother, who was represented by counsel, testified at the hearing that she "had a little bit of a drug problem." She further stated, "I'm not asking for full custody of [Infant] right now," and "[Infant] does not need to be completely in my care...." At the close of the evidence, the guardian ad litem representing the Infant recommended that the juvenile court assume jurisdiction over the Infant as he felt that the "petition has been proven by clear and cogent evidence."
The juvenile court entered its finding of jurisdiction in which it determined that the allegations in the petition were established by clear, cogent, and convincing evidence and, therefore, Infant was under the court's jurisdiction pursuant to section 211.031.1(1). The juvenile court also entered its order and judgment of disposition placing Infant in the legal custody of DFS under supervision of the court until further order. Infant was placed in the physical custody of Mother's grandmother, who had been the primary babysitter in the past.
On appeal, Mother now asserts that the juvenile court erred in that it lacked jurisdiction to enter its order and judgment because there was insufficient evidence that Infant was in need of care and treatment pursuant to section 211.031.
Section 211.031 provides in pertinent part:
1. Except as otherwise provided in this chapter, the juvenile court ... shall have exclusive original jurisdiction in proceedings:
(1) Involving any child ... who is alleged to be in need of care and treatment because:
(a) The parents, or other persons legally responsible for the care and support of the child ... neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being;...
(b) The child ... is otherwise without proper care, custody or support; ...
Juvenile proceedings are in the nature of civil proceedings, and the standard of review is the same as in a court-tried case. In Interest of S.B., 712 S.W.2d 18, 19 (Mo.App.1986). The standard of review of the assertion of jurisdiction by the juvenile court upon finding that a child is in need of care because of parental neglect is one of deference to the juvenile court, whose judgment will be sustained unless there is no substantial evidence to support it. Id.
To assert jurisdiction under section 211.031.1(1), the juvenile court must find clear and convincing evidence that the child is in need of care because the parent has neglected to provide the care necessary for the child's well-being. In Interest of L.J.M.S., 844 S.W.2d 86, 92 (Mo.App. 1992). In reviewing the sufficiency of the evidence, we consider the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's judgment, and defer to the trial court on matters of witness credibility. In Interest of R.G., 885 S.W.2d 757, 763 (Mo.App. 1994).
Mother contends that the record reflects only one isolated instance of poor judgment, and that such evidence does not prove she neglected to properly care for Infant. In support of her argument, Mother relies on In re S.B. In S.B., a mother left her child at her aunt's residence for an afternoon. S.B., 712 S.W.2d at 19. Because the mother's aunt was not *411 home, she left the child in the care of her 18-year-old cousin. Id. That afternoon, the cousin sexually molested the child, causing the child to become infected with gonorrhea and herpes. Id. The juvenile authorities took custody of the child and filed a petition charging the mother with neglect. Id. The petition alleged that mother's cousin had previously sexually molested another child and that mother "was aware of the prior sexual molestation." Id. This court reversed the trial court's finding of neglect because "[t]here was no substantial evidence that [mother's cousin] had, in fact, previously abused the other child." Id. Although the evidence showed that the cousin had been charged with sexual abuse, he had never been convicted. Id. Moreover, mother and her sister testified that they had reason to believe that the prior sexual abuse charge was a fabrication that resulted from a totally unrelated "family feud." Id. This court found that, although mother did not exercise "the best judgment" in leaving her child with someone who had previously been charged with sexual abuse, she had a reasonable basis to believe the charge was unjust. Id. Because there was "[n]o other evidence even remotely intimat[ing] the absence of concerned parenting," this court concluded that this "isolated incident" did not suggest mother failed to supply the child with the minimum quality of care that the community would tolerate. Id.
Mother further contends her case is indistinguishable from S.B. because the record reflects only one isolated instance in which Mother failed to exercise the best judgment, but did not neglect Infant because she reasonably believed that the 12-year-old and the elderly blind woman could provide proper care.
While we ultimately agree with Mother that the evidence presented in this record is insufficient to prove "neglect," it is important to correct Mother's misinterpretation of S.B. and to further set out recognized principles applicable to all neglect cases.
A pattern of neglect is not necessary for a court to assert jurisdiction. The juvenile court does not have to find that a dangerous situation exists, but only that there has been a failure to supply the child with the minimum quality of care that the community will tolerate. In the Interest of M.A.T., 934 S.W.2d 2, 3 (Mo.App.1996). When faced with a potentially harmful situation, the juvenile court need not wait until harm is done before it can act. In Interest of J.J., 718 S.W.2d 235, 237 (Mo. App.1986). Rather, the court is authorized to act to prevent the deterioration of a child's situation. Id.; In Interest of E.J., 741 S.W.2d at 894. At the risk of being wrong, we are required to protect innocent children who cannot care for themselves.
Although the concurring opinion states without legal authority, "that it is in a child's best interest to remain in the custody of his or her parents, unless the evidence clearly indicates otherwise," our paramount consideration is the welfare of the child, which supercedes our preference for parental custody. In Interest of E.J., 741 S.W.2d 892, 894 (Mo.App.1987).
Despite some testimony which hinted at problem areas in Mother's character and ability to care and support Infant, we find the evidence adduced at the hearing was insufficient in several respects for the court to assume jurisdiction of Infant. The record presented to us on appeal does not clearly convince us that the court should have assumed jurisdiction over Infant. The juvenile court, as well, stated, "this is not the worst case we've ever seen" and "in the scale of one to ten, this is way *412 down at the bottom of the list (sic) kind of case as far as I am concerned."
First, Mother testified that she spent several days a week with her grandmother in St. Louis, who had been the normal babysitter for Infant. She also lived 3-4 days a week in the trailer in Franklin County, where the 12-year-old girl and the girl's elderly, blind grandmother also resided. It is unclear what the exact living conditions were that Mother was providing Infant. Mother testified that when she stayed at the trailer, she and Infant slept in the living room and kitchen. The caseworker stated the living room and kitchen area of the trailer were reasonably clean and there was adequate food for Infant. She found the bedroom not in good condition, with no sheets on the bed, dirty clothes strewn about, and a bag of sexual devices in a corner, however, the only evidence regarding Infant's exposure to these inappropriate areas of the trailer was hearsay testimony from the 12-year-old babysitter that Infant was not allowed in these areas.
Second, Mother explained her absence for 19 hours from Infant and her failure to contact the caregiver was due to a court appearance she was required to make in the St. Louis City courts where she was a defendant in a criminal proceeding. We do not know the nature of this proceeding, its disposition, nor its impact on her ability to care for Infant.
Third, Mother's admission of a drug problem was stated by her as being in the past. No evidence was adduced if she still used illegal drugs, had any criminal convictions, or had been unable to care for Infant due to her usage of drugs.
Fourth, the juvenile court's judgment, as required by section 211.183 stated that among the reasonable efforts to prevent or eliminate the need for removal of Infant, that various services had been provided to Mother "pursuant to [an] active and ongoing protective services case." It further stated, "DFS maintained an open protective services case, including actively working with Mother to keep the child safely in her home." The record, however, is devoid of the nature of the active and ongoing protective service case against Mother.
Although one witness from the Franklin County Division of Family Services office testified there was a protective service case that had been opened due to Mother's testing positive for methamphetamines at Infant's birth, there was inconclusive evidence regarding whether there was an open juvenile court proceeding in St. Louis City courts. The court herein concluded the hearing on September 21, 2000, asking the parties for verification of what other orders and proceedings had possibly been entered regarding the custody of Infant. Neither the October 5, 2000 judgment, nor any other part of this record, provides an answer to that issue.
We are mindful of our standard of review to consider the evidence and all reasonable inferences therefrom in the light most favorable to the judgment, and give due regard to the opportunity of the juvenile court to judge the credibility of witnesses. In Interest of T.S., 925 S.W.2d 486, 487 (Mo.App.1996). We find that the limited evidence presented at the hearing, however, is not sufficient to meet the requirements of section 211.031.1(1) for the court to take jurisdiction over Infant. The juvenile court's judgment is reversed.
ROBERT G. DOWD, JR., P.J., concurs.
RICHARD B. TEITELMAN, J., concurs in result only by separate opinion.
I concur in result only. The trial court's decision constitutes excessive and unreasonable *413 government intrusion into the privacy and integrity of the parent-child relationship. We must reverse because (1) the trial court's judgment violates the fundamental principle that a child should not be removed from the parent's custody unless such action is clearly shown to be in the best interests of the child; (2) as a matter of law Mother's conduct in this case, even if the facts as alleged in Juvenile Officer's petition are taken as true, does not amount to "neglect" within the meaning of Section 211.031.1(1); and (3) assuming arguendo that such conduct could amount to "neglect" under the statute, the alleged conduct was not proved by the standard of clear and convincing evidence that the law requires.

FACTUAL AND PROCEDURAL BACKGROUND
Though we agree in many respects, I cannot concur with the majority's characterization of the facts. Following is a statement of the facts:
Mother left Infant at her friend's trailer residence in Franklin County sometime in the early morning hours of April 10, 2000. She did so because she was scheduled to appear in court in the City of St. Louis at 9 a.m. She did not have a car and relied on her friend, who worked the third shift at a job in St. Louis, for transportation. The friend's elderly, legally blind mother and 12 year old daughter were to care for Infant during Mother's absence. Mother had earlier made arrangements with her own grandmother to care for Infant on this occasion during her trip to court in St. Louis, but those plans fell through on short notice.
While Mother was in court, DFS received an emergency report stating, inter alia, that the 12-year-old caregiver "couldn't take it any longer," that she was watching Infant but that there was no food in the house, and that she had contacted her own mother by phone and her mother had instructed her to feed Infant cornmeal.
A DFS investigator then came to the babysitter's house. She found Infant, the 12-year-old girl and the girl's legally blind grandmother. She found that there was sufficient and appropriate food in the residence for Infant, and that it generally met minimum community standards of cleanliness, but that there were some problems, including among others a dirty bed with no sheets in the babysitter's mother's bedroom, drawers on the chest of drawers pulled out with items hanging out, and laundry on the floor of the hallway and bathroom. The DFS investigator further determined, based upon her observations, that the girl's legally blind grandmother was unable to care for Infant by herself; and the girl was emotionally upset. The investigator attempted to contact Mother by calling the four emergency numbers that Mother had left at the trailer, but her attempts were unsuccessful. The investigator then took Infant into protective custody. Later that day the investigator was able to contact Mother's grandmother, who picked up Infant and took him into her home.
The next day, the Franklin County Juvenile Officer filed a petition alleging that Infant was in such condition or surroundings that his welfare required the court to take immediate custody. An amended petition was later filed, specifically alleging that Infant was in need of care and treatment under the supervision of the court because: (a) Mother was unable to be located at the emergency numbers she had left at the trailer; (b) Infant was inappropriately left with a 12-year-old and her grandmother, both of whom were incapable of providing proper care; and (c) the trailer was "filthy" because there were no sheets on the beds, dirty clothes were *414 strewn about, drawers were pulled out, and "a bag of sexual devices" was found sitting in the corner of the 12-year-old girl's mother's bedroom.
At trial Mother admitted, during cross-examination, that in the past she "had a little bit of a drug problem." She had tested positive for methamphetamine use at the time of Infant's birth, and as a result had received some counseling and other social services from DFS. There is no evidence that Mother currently suffered from a drug problem at the time of trial.
Following trial, the court entered its finding of jurisdiction in which it determined that the allegations of the petition were established by clear, cogent and convincing evidence and, therefore, that Infant was under the court's jurisdiction pursuant to Section 211.031.1(1). At the same time the court also entered its judgment and order of disposition placing Infant in the legal custody of DFS under supervision of the court until further order.[1] This appeal follows.
On appeal, Mother contends that the trial court erred in finding her guilty of neglect under the statute, and that the court lacked jurisdiction to enter its judgment and order of disposition because there was insufficient evidence supporting it.

DISCUSSION
I. THE BEST INTERESTS OF THE CHILD ARE SERVED BY REMOVING A CHILD FROM HER PARENT'S HOME ONLY WHEN IT IS CLEARLY NECESSARY
The majority opines that our paramount concern in juvenile cases is the welfare of the child, which supercedes our preference for parental custody. We must keep in mind, however, that it is in a child's best interest to remain in the custody of his or her parents, unless the evidence clearly indicates otherwise.
A legal parent has a fundamental liberty interest in the care, custody and nurturance of his or her child. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-1213, 31 L.Ed.2d 551 (1972). Parental rights are not absolute, and a parent's fundamental right to custody and control of a child may, for example, be infringed upon by the state if the parent endangers the health or safety of the child. Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). "The general rule that natural parents have a primary right to the custody of their children is controlling," however, "when it is consistent with the welfare of those children." In the Interest of C.L.M., 625 S.W.2d 613, 617 (Mo. banc 1981). Only when the two are in conflict is the rule favoring parental custody "superceded by the concerns of the state for the child's welfare." Id. Accordingly, when parental neglect proceedings are brought under Section 211.031, "parental rights should be limited only to the extent necessary ...," and, even in those cases where they need to be limited, this should be done with a view to achieving "the most desirable goal, whenever possible, of reinstating the natural and normal parent and child relationship." Id. (emphasis added) "This is so because the rule favoring natural parents stems from the presumption that maintaining the natural parent-child relationship is best for the child." Id.
Countless psychological and child development studies have shown that children especially infants and young children under *415 the age of fivewho are needlessly separated from their familiar parent suffer resulting deficits in their emotional and intellectual development. Joseph Goldstein, Albert J. Solnit, Sonja Goldstein and Anna Freud, The Best Interests of the Child: The Least Detrimental Alternative, 20 (1996). The complex and vital parent-child interactions necessary for healthy child development "thrive in the protective enclave of family life under guardianship by parents who are autonomous." Id. at 90. "When family integrity is broken or weakened by state intrusion, [the child's] needs are thwarted.... The effect on the child's developmental progress is likely to be detrimental." Id. Accordingly, courts should follow an approach of cautious restraint in intruding on the family relationship one which recognizes that parents are generally entitled to raise their children as they think best, free from state interference, and which favors the minimum amount of state intervention necessary consistent with the best interests of the child.
We must also remember that, although it is a temporary order subject to later modification, the reality is that an adjudication of parental "neglect" under Sections 211.031 and 211.181, which empowers the juvenile court to assume jurisdiction over a child to the temporary exclusion of the parent, constitutes prima facie evidence of permanent neglect in the not-too-distant-future, "and so augurs a termination of the parental right altogether." In Interest of A.L.W., 773 S.W.2d 129, 134, (Mo.App. W.D.1989); In re Monnig, 638 S.W.2d 782, 786 (Mo.App. W.D.1982).
The transcript does not reveal any evidence that it was necessary, and consistent with the child's needs and best interests, to remove the child from the custody of Mother.[2] Although the Order of Disposition contains conclusionary recitals that "removal of the juvenile from the juvenile's parent, guardian or custodian was necessary to protect the juvenile from personal harm," and that "because of the emergency nature of the situation" the court "finds the conditions requiring alternative care are continuing," nothing in the record supports those conclusions. Likewise, the transcript does not reflect that DFS engaged in the "reasonable efforts" required by law to eliminate the need for removal of Infant from Mother's care after the day this babysitting incident occurred, or to make it possible for Infant to return home. See Section 211.183. The mandates of Section 211.183 express the legislative concern for maintaining the integrity of the family. In Interest of A.L.W., 773 S.W.2d at 133-34. Further, it is reversible error, justifying the setting aside of an order of disposition, if the order removes a child from the parent's custody without substantial evidence to support the finding that "reasonable efforts" have been made. Id. at 134, 135.
Thus, even assuming that the conduct charged to Mother was reasonably deemed to constitute "neglect" within the meaning of Section 211.031.1, and even assuming that the alleged conduct was proved by clear and convincing evidence, the order removing Infant from Mother's custody lacked a proper basis. Accordingly, as a matter of plain error and to correct manifest *416 injustice, the Order of Disposition must be reversed and set aside.[3]
II. AS A MATTER OF LAW, MOTHER'S CONDUCT DID NOT CONSTITUTE A VIOLATION OF SECTION 211.031.1(1)
Mother's conduct in this case, even if all of the facts as alleged in the petition are taken as true, does not rise to the level of actionable neglect within the meaning of Section 211.031.1(1). The statute says, in pertinent part:
"... the juvenile court ... shall have exclusive original jurisdiction in proceedings:
(1) Involving any child ... who is alleged to be in need of care and treatment because:
(a) The parents ... neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being...."
A survey of the reported cases shows that the operative definition of "neglect" as used in the context of Section 211.031 is unclear and imprecise. Some cases speak of "an absence of concerned parenting." In Interest of S.B., 712 S.W.2d 18, 19 (Mo.App. E.D.1986). Other cases refer to a "course" of "neglectful conduct." In Interest of R.G., 885 S.W.2d 757, 765 (Mo. App. E.D.1994). Still other cases state that the petition need only show that the child "is in need of care." In Interest of M.A.T., 934 S.W.2d 2, 3 (Mo.App. W.D. 1996). Many of these same cases state that in order to properly assert jurisdiction under the statute, the court only needs to find that there has been a failure to supply the child with "the minimum quality of care which the community will tolerate." Id.; In Interest of E.J., 741 S.W.2d 892. 894 (Mo.App.E.D.1987).
Ironically, the Missouri origin of the concept of "neglect" being defined as the failure to provide "the minimum quality of care which the community will tolerate" is In re C___ ___F___ ___B___, 497 S.W.2d 831 (Mo.App.1973)the only Missouri case in which the meaning of "neglect" within the statute was given lengthy consideration and analysis. See Id., at 834-837. The same opinion and analysis, however, concluded that "neglect" as contemplated by the statute was a term having no fixed meaning; that its meaning cannot be found "by searching for legal precedent"; that its meaning can be discerned only by "an analysis of the individualized facts of each special case"; and that in the end the term permits of no certainty, and "protection from vagueness" can be found only "in the wisdom of judges rather than the detail of statute." Id. at 834, 835.
If "neglect" does not have a reasonably precise meaning, then it can mean virtually anything.[4] Such vagueness can be a problem because, among other reasons, it gives neither fair warning to parents nor adequate guidance for courts and administrative agencies. It "invests judges and state agency personnel as parens patriae with almost limitless discretion to act in accord with their own child-rearing preferences in areas generally under the exclusive control of parents. It invites the abuse of parents and children by state officials and has led *417 to discrimination against poor, minority, nontraditional, and other disfavored families." Goldstein, et al., supra, at 94. Thus, in the case at hand, we need to address two questions: (1) How can "neglect," within the context of Section 211.031.1, be defined in a reasonably narrow and specific way? And (2), so construed, does the conduct for which Mother was charged fall within that statutory meaning?
1. Three Factors Limiting the Statutory Meaning of "Neglect" Under Section 211.031.1
First, the statute requires that the child be "in need of care and treatment," which "need" has arisen because of a parent's neglect in failing to provide care or support necessary for the child's well-being. In Interest of R.G., 885 S.W.2d at 763; In Interest of L.J.M.S., 844 S.W.2d 86, 92 (Mo.App. E.D.1992); In Interest of K.H., 652 S.W.2d 166, 167 (Mo.App. E.D.1983). This statutory language necessarily implies that the alleged need for care that is the basis of the petition must have arisen "due to" the parent's neglect. See In Interest of C.T., 942 S.W.2d 467, 468 (Mo. App. S.D.1997). Likewise, the language necessarily implies that the act or acts of neglect alleged to have occurred must have resulted in the child's having an unfulfilled present need for care and treatment. See R.G., 885 S.W.2d at 763. That is, both elements must be presenta past incidence of neglect will not in and of itself suffice to satisfy the requirements of the statute, if it has not led to a presently existing need for alternative care and treatment; and by the same token, a presently existing need for care and treatment will not satisfy the statute unless it has directly resulted from a past act or acts of parental neglect.
Second, our courts have also stated that a basic purpose of the law is to prevent "the social, physical and psychological deterioration of children." In Interest of C.L.M., 625 S.W.2d 613, 616 (Mo. banc 1981); L.J.M.S., 844 S.W.2d at 92. Thus, to satisfy the requirements of the statute the situation that is alleged to form the basis of a "neglect" petition must be a potentially harmful one to the childthat is, it must involve a reasonable likelihood that, without the court's intervention and assumption of jurisdiction, the child's physical, medical, educational or emotional well-being will be harmed.
Third, when there is no clear need of medical or other immediate care as a result of the past parental conduct, and when that conduct has not been severely neglectful, then there reasonably, at a minimum, ought to be some indication of a pattern or course of past conducti.e., some credible indication that the troubling conduct has either happened a number of times in the past, and/or is likely to happen again in the future, unless the court intervenes. Under such circumstances one isolated incident, which may perhaps reflect poor judgment on the part of a parent but which is neither reflective of a past pattern of behavior nor likely to recur in the future, is not normally enough to satisfy the requirements of the statute and justify a finding of "neglect." See, for example, In Interest of S.B., 712 S.W.2d at 19.
2. Does Mother's Conduct Meet These Factors?
Measured against these factors, Mother's conduct in this case, even when all of the facts as alleged in the petition are admitted, does not rise to the level of actionable "neglect" within the meaning of the statute. Mother needed to go to court in St. Louis and, at most here, made a bad babysitting decision. Because of transportation difficulties, she had to leave the night before. Mother left Infant in the *418 care of a 12-year-old girl and the girl's legally blind grandmother. The 12-year-old became emotionally overwhelmed with the responsibility of babysitting for Infant. The petition charges simply that during this incident (a) Mother left Infant with the 12-year-old girl and her elderly grandmother, (b) Mother could not be reached at any of the emergency telephone numbers she left the caregivers, and (c) the back bedroom area of the trailer home where she left Infant with the caregivers was somewhat unclean and untidy.
The record also reveals, however, certain other facts and circumstances that are essentially undisputed: Mother left four phone numbers with the caregiversher mother's, her grandmother's, her work number, and her pager number. The record also shows that the reason DFS was not able to immediately reach her at her pager number was because she was in court, and the Circuit Court of the City of St. Louis has a policy of prohibiting citizens from bringing cell phones or pagers inside the civil courts building. Additionally, with respect to the condition of the trailer home, the record shows that (a) the trailer was not Mother's but rather that of her friend, and (b) the DFS investigator and the Juvenile Officer admitted that the home generally exceeded minimum community standards of cleanliness; only the back bedroom area had a few problems.
There also is evidence in the record showing that Mother's grandmother was usually the babysitter for Infant. Indeed, the record shows that Mother had planned and made arrangements in advance with her grandmother to care for Infant on the night in question, and that the only reason she eventually turned to the 12-year-old and her legally blind grandmother instead is because her prior arrangements with her grandmother fell through on short notice. Even if Mother's last-minute change in babysitting plans might be seen as a single instance of "neglect," there is no pattern of any prior conduct, but rather only a one-time isolated incident. See S.B., 712 S.W.2d at 19.
Although Mother testified that the 12-year-old girl was never entrusted with the sole care of Infant for any length of time prior to the day in question, Mother stated that she had previously observed the 12-year-old assisting many times, in the presence of others, with Infant's care, and she had observed the 12-year-old preparing Infant's bottle and feeding him. The record supports that Mother reasonably believed the 12-year-old, with the aid of her legally blind grandmother, could adequately care for Infant during her absence. Given that she had such a reasonable belief, and especially given that nothing in the record indicates Infant was harmed or ever in any danger, her choice of babysitter cannot be characterized as "neglect." In Interest of S.B., 712 S.W.2d at 19.
For the foregoing reasons I would find, as a matter of law, that the conduct which occurred in this case does not constitute "neglect" within the meaning of the statute.
III. NEGLECT WAS NOT PROVEN BY CLEAR AND CONVINCING EVIDENCE, OR EVEN BY SUBSTANTIAL EVIDENCE
In a hearing on a petition under Section 211.031.1 which alleges that a child is in need of care and protection of the juvenile court due to parental neglect, the required standard of proof is by clear and convincing evidence. In Interest of C.T., 942 S.W.2d at 468, n. 4; In Interest of R.G., 885 S.W.2d at 763; In Interest of D.D.H., 875 S.W.2d at 186; In Interest of L.J.M.S., 844 S.W.2d at 92. This remains true notwithstanding the fact that former Rule *419 117.05(b) was recently repealed,[5] for there is a constitutional basis which mandates this strict standard of proof in such proceedings:
... although a temporary order and so subject to modification, [a judgment granting the petition] nevertheless implicates the fundamental right of natural parents to rear their own children free of undue governmental interference. It is an interest due process protects by a clear and convincing standard of proof, as well as by other procedures. Santosky v. Kramer, 455 U.S. 745, 753-754, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599; In re Monnig, 638 S.W.2d at 785, 786.
In Interest of A.L.W., 773 S.W.2d at 134.
In contrast to a mere preponderance of the evidence,[6] evidence is clear and convincing when it "instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true." In re T.S., 925 S.W.2d 486, 488 (Mo.App. E.D.1996); In re C.W., 753 S.W.2d at 938. The difference between the two standards can be "crucial to the outcome" of a case. Matter of T.C.M., 651 S.W.2d at 530. Further, the standard of review of a court-tried case under Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976) is somewhat affected when the requisite standard of proof at trial is by clear and convincing evidence and sufficiency of evidence is challenged on appeal. "Substantial evidence as used in Murphy means clear, cogent and convincing evidence when that standard of proof is applicable." Matter of O'Brien, 600 S.W.2d 695, 698 (Mo.App. W.D.1980). See also Matter of F.Z., 637 S.W.2d 380, 381 (Mo.App. E.D. 1982). Our Supreme Court, in finding that the standard of review on appeal is not inconsistent with the clear and convincing standard of proof when that is the required quantum of proof at trial, expressly cited and relied upon the holding in O'Brien. In re Adoption of W.B.L., 681 S.W.2d 452, 454 (Mo. banc 1984).
Thus, we must reverse the judgment in this case unless we can properly conclude that the evidence was so clear and convincing that it "instantly tilts the scales" in favor of finding that Mother was guilty of neglect. That is not the case here.
Beyond what I have previously noted concerning the record, all of the 12-year-old girl's hearsay statements should be disregarded, because they were properly objected to and clearly constitute inadmissible hearsay. Because she was not herself the alleged victim of abuse or neglect, the girl's statements plainly do not fall within the special hearsay exception recognized *420 by the court in In the Marriage of P.K.A., 725 S.W.2d 78, 81 (Mo.App. S.D. 1987).[7] Yet P.K.A. was the express basis that the trial court cited in overruling Mother's hearsay objection, and the girl's statements were allowed in for their purported truth. Further, it is apparent that the trial court relied upon the girl's hearsay statements that she felt overwhelmed by the responsibility of caring for Infant in making its decision, because those statements constitute virtually the only evidence at trial to suggest that the girl was not, in actual fact, capable of adequately caring for Infant during Mother's absence.
Therefore, even totally laying aside all of the other problems and weaknesses of petitioner's evidence in this case, the girl's inadmissible hearsay statements are, standing alone, a reason to reverse the judgment. Incompetent and inadmissible evidence is, by definition, not the kind of "substantial" evidence upon which a trial court may properly base its decision. Because the trial judge actually relied upon this improper evidence, see Wilson v. Sullivan, 922 S.W.2d 835, 838 (Mo.App. E.D. 1996), and the remaining evidence could not be enough to support the trial court's conclusion, see In the Interest of T.B., 963 S.W.2d 252, 257 (Mo.App. W.D.1997), the judgment cannot stand.
NOTES
[1] All further statutory references are to RSMo 2000 unless otherwise indicated.
[2] Although Mother testified that she unsuccessfully attempted to call her grandmother to have her check on Infant, she never called Infant's caregivers directly.
[1] The judgment and order did not specify who would get physical custody of Infant. Infant was placed by DFS with Mother's grandmother. There is no evidence in the record as to Mother's visitation schedule.
[2] The trial court did not need to remove Infant from Mother's custody. It certainly had the statutory authority to conclude that, although a technical violation of the standard of parental care required by Section 211.031.1 may have occurred, the matter could nonetheless be adequately addressed through continuing placement of Infant's care and custody with Mother, under court-supervised conditions. See Section 211.281.1.
[3] On appeal Mother has challenged only the court's finding of jurisdiction and neglect, and has notat least not directlychallenged the order of disposition. However, under Rule 84.13(c), plain errors affecting substantial rights may properly be considered on appeal, even though not raised or preserved, if the Court finds that manifest injustice or a miscarriage of justice has resulted therefrom.
[4] As Professor Arno C. Becht, of Washington University Law School, often said: "If something means everything to everyone, then it means nothing to anyone."
[5] Former Rule 117.05 provided:

a. In all hearings upon a petition alleging as a basis for jurisdiction that the juvenile has committed an act or acts which would be a crime if committed by an adult, such act or acts shall be proved beyond a reasonable doubt.
b. In all other hearings the facts alleged shall be proved by clear and convincing evidence.
Rule 117.05 (repealed effective January 1, 1999). The rule was repealed due to confusion it engendered regarding the beyond a reasonable doubt standard's applicability in certain juvenile court proceedings. See discussion at C.L.B. v. Juvenile Officer, 22 S.W.3d 233, 237 (Mo.App. W.D.2000); cf. N.J.B. v. State, 941 S.W.2d 782, 784-785 (Mo. App. W.D.1997.
[6] "Preponderance of the evidence" is defined as that degree of evidence which "is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved more probable than not." Vaught v. Vaughts, Inc./Southern Missouri Constr., 938 S.W.2d 931, 941 (Mo.App. S.D. 1997).
[7] The admission of these hearsay statements denied Mother any opportunity to cross-examine her prime "accuser." Evidence was admitted at trial to suggest that the 12-year-old's statements may have been motivated by something other than concern for Infant. The DFS investigator acknowledged in her testimony that there was an ongoing family dispute between the 12-year-old's girl's mother and father, and that the girl was upset with her mother. Because the girl was not present to testify, Mother's counsel was not allowed to explore the girl's motivation at trial. The State should not be allowed to circumvent Mother's due process right to cross-examine her accusers by allowing improper hearsay.