91 S.W.3d 745 (2002)
B.T.O., Plaintiff,
JUVENILE OFFICER, Respondent,
v.
M.O. (Mother); Appellant,
J.O. (Father), Defendant.
No. WD 61182.
Missouri Court of Appeals, Western District.
December 24, 2002.
*746 John L. Pursley, Butler, MO, for Appellant.
Diana D. Thomas, Butler, MO, for Defendant/Plaintiff.
James E. Switzer, Clinton, MO, for Respondent.
Before: PAUL M. SPINDEN, P.J., PATRICIA A. BRECKENRIDGE and THOMAS H. NEWTON, JJ.
THOMAS H. NEWTON, Judge.
M.O. (mother) appeals from an amended judgment and disposition order that placed B.T.O. (child) with the step grandparents.

I. FACTUAL AND PROCEDURAL BACKGROUND
Mother has a three-year-old daughter, B.T.O. On January 16, 2002, the Bates County Juvenile Officer filed a petition alleging that B.T.O. was in need of care and treatment because of mother's behavior. The petition alleged that on January 15, 2002, mother was "acting in a bizarre and unstable manner and admitted to her family that she was using methamphetamine." The petition further alleged that mother "repeatedly leaves [B.T.O.] with friends and family for extended periods of time without providing support for her care." Upon reviewing the petition, the juvenile court issued an ex parte protective custody order, placing B.T.O. in the temporary custody of mother's stepfather and his wife.
The juvenile court held an adjudication hearing on February 8, 2002. At that time, the juvenile officer called three witnesses: one of mother's friends who had cared for B.T.O.; the DFS social service worker assigned to the case; and stepfather's wife.
*747 Ellen Whitten, the friend who had cared for B.T.O. in mother's absence, testified that she started doing so at mother's request when B.T.O. was two weeks old. Initially, she cared for B.T.O. once or twice a month. As time went on, she and another individual cared for B.T.O. more often. B.T.O. sometimes spent only one or two days a week in mother's home. Mother did not pay Ms. Whitten to care for B.T.O., and Ms. Whitten did not ask for payment. Ms. Whitten sometimes criticized mother's lack of parenting. She was concerned that mother did not spend enough time with B.T.O. and that mother did not feed her properly. Instead of caring for B.T.O., mother was "going out all hours of the night, coming in, sleeping half the day." On one occasion mother dropped B.T.O. off at Ms. Whitten's home in the middle of the night and then left. Ms. Whitten was also concerned about mother's drug use. Three months before the adjudication hearing, mother admitted to Ms. Whitten that she was using "crank."[1]
Ms. Whitten last cared for B.T.O. in September 2001. Mother's stepfather and his wife cared for B.T.O. for much of the time between October 2001 and January 2002. The wife estimated that she and her husband cared for B.T.O. one half of October, three-quarters of November, and all of the days between December 9, 2001, and January 4, 2002. The wife recounted mother's "very bizarre" and "very paranoid" behavior on January 15, 2002. She described mother as going "200 miles a minute." At that time, mother admitted that she was on "crystal meth."
Ms. Debra Taylor, the DFS social service worker assigned to the case, testified that she began investigating allegations of neglect in October 2001, after receiving a report claiming that mother's boyfriend had made sexually-inappropriate remarks about B.T.O.[2] During the course of her investigation, Ms. Taylor also inquired about allegations that mother used drugs. Although mother was "very defensive" when asked about drug use, she ultimately submitted to two drug tests in October and November 2001, both of which were negative. Mother refused to cooperate further. She did not respond to Ms. Taylor's telephone calls and letters after November 2001.
Mother testified in her own behalf. She denied using drugs and claimed that she had cooperated with DFS when asked to submit for drug tests. She explained her behavior on January 15, 2002, as the result of anxiety over car brakes that had recently failed.[3] She explained her admission of "crystal meth" use as an attempt to "shock" her family and get them to listen to her. She said that she attempted to provide necessities to B.T.O. while B.T.O. was living with her stepfather and his wife; she took shoes and clothes there and "offered to take groceries." She also claimed that she had provided her family with B.T.O.'s WIC vouchers. She conceded that she had allowed B.T.O. to stay with others "more often than she should have" *748 but claimed that she had done so at their request.
In its amended jurisdictional findings and judgment, the juvenile court determined that it had jurisdiction under § 211.031.[4] It ruled that mother had neglected B.T.O. in the following manner:
On January 15, 2001, and previous dates, [mother] was using methamphetamine and [was] not able to provide any proper care, custody, or control of [B.T.O.]; in fact, she had left the child with [the stepfather and his wife] for weeks at a timevisiting only sporadically, and collecting AFDC payment and not using it to support the child.
In its amended judgment and order of disposition, the juvenile court placed B.T.O. with mother's stepfather and his wife.
This appeal follows. Mother raises three points on appeal. In her first point, mother contends that the juvenile officer presented insufficient evidence that she had neglected B.T.O. In her second point, mother contends that the juvenile court failed to conduct an investigation of the stepfather and his wife under § 211.181.1 before placing B.T.O. with them. In her third point, mother contends that the juvenile court failed to make the findings required by § 211.183.5 in its disposition order.

II. STANDARD OF REVIEW
"Review of juvenile proceedings is analogous to review of court-tried cases." In re T.B., 936 S.W.2d 913, 914 (Mo.App. W.D.1997). Accordingly, we will disturb the juvenile court's order only if there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Id. We defer to the juvenile court on issues of fact and witness credibility. Id. When reviewing the sufficiency of the evidence, we view the facts presented in evidence and the reasonable inferences therefrom in the light most favorable to the juvenile court's judgment. In re J.M.C., 920 S.W.2d 173, 175 (Mo.App. W.D.1996).

III. LEGAL ANALYSIS
A. The Juvenile Officer Presented Sufficient Evidence of Neglect
Viewing the evidence in the light most favorable to the juvenile court's finding and deferring to the court's credibility assessments, we conclude that substantial evidence exists to support the finding of neglect. This evidence demonstrates that mother used illegal drugs and abdicated her basic parental responsibility for B.T.O.
Mother has admitted that she used illegal drugs in the months leading up to trial. Three months before the adjudication hearing, she told Ms. Whitten that she had been using "crank" and that she "had been clean for two days at one point in time." On the day before the juvenile court issued its ex parte order for protective custody in this case, mother likewise admitted that she was using methamphetamine and described a recipe for making "crystal meth."
Although mother points out that she tested negative for drugs two times during October and November 2001, this evidence suggests only that mother did not have drugs in her system on the two occasions when she submitted to testing. It is not unreconcilable with mother's admissions. Indeed, after submitting to the first two tests, mother subsequently refused to cooperate with DFS. The juvenile court properly weighed the drug test results against mother's admissions and accompanying behavior, reconciling the evidence *749 accordingly. See In re C.N.W., 26 S.W.3d 386, 394 (Mo.App. E.D.2000) ("The presence of evidence in the record that might support another conclusion does not necessarily establish that the trial court's decision is against the weight of the evidence.").
The juvenile court also properly determined that mother had abdicated basic parental responsibility for B.T.O. Ellen Whitten testified that mother frequently left B.T.O. with her while "going out all hours of the night, coming in, sleeping half the day." On one occasion, mother dropped B.T.O. off at Ms. Whitten's home without notice in the wee hours of the morning. Ms. Whitten worried that mother did not spend enough time with B.T.O. or feed her properly.
During the three-and-one-half months before DFS intervened, B.T.O. lived almost exclusively with mother's stepfather and his wife. Mother did not spend the Thanksgiving or Christmas holidays with B.T.O. Mother had contact with B.T.O. for only six days in December 2001. Mother had contact with B.T.O. for only two-and-one-half days in January 2002 before DFS intervened. Cf. In re G.C., 50 S.W.3d 408, 412 (Mo.App. E.D.2001) (insufficient evidence of neglect where mother left child alone only once and had reasonable explanation for doing so); In re A.H., 689 S.W.2d 771, 775 (Mo.App. W.D.1985) ("This is not to say that a petition ... showing that the children were living with the sister without contact or help by the mother and with no excuse or reason for an extended or indefinite stay, backed up by supporting evidence would not invoke court jurisdiction.").
Unlike the parents in G.C. and A.H., mother in this case effectively abandoned her daughter to friends and relatives for weeks at a time without justification. Mother does not work. She receives financial aid, yet Ms. Taylor reports that she has only provided B.T.O. with "a little bit of food" since the juvenile court placed B.T.O. with stepfather and his wife.
Although mother suggests that she left B.T.O. with friends and relatives at their request, the record suggests otherwise. Ms. Whitten certainly did not ask mother to leave B.T.O. with her in the middle of the night without warning. According to Ms. Whitten, mother "just always seemed to want to have someone else take care of [B.T.O.] so she could go and do her thing."
Taken together, this evidence shows that mother neglected B.T.O. We disagree with mother's premise that an absence of current harm to the child precludes a finding of neglect here. As this court's Eastern District recently said:
A pattern of neglect is not necessary for a court to assert jurisdiction. The juvenile court does not have to find that a dangerous situation exists, but only that there has been a failure to supply the child with the minimum quality of care that the community will tolerate. When faced with a potentially harmful situation, the juvenile court need not wait until harm is done before it can act. Rather, the court is authorized to act to prevent the deterioration of a child's situation. At the risk of being wrong, we are required to protect innocent children who cannot care for themselves.
In re G.C., 50 S.W.3d at 411 (citations omitted).
Given the evidence regarding mother's drug use, her erratic behavior, and her failure to care for B.T.O., the juvenile court properly acted before B.T.O. suffered harm. Point I is denied.
Although we conclude that the juvenile court properly found that mother had neglected B.T.O., this conclusion does not end our inquiry. We next must determine *750 whether the juvenile court's subsequent disposition order complied with the applicable statutory requirements. As discussed below, we conclude that the disposition order complied with § 211.183.5. But we hold that it did not comply with § 211.181.1, and so we remand the case for further proceedings to address the deficiencies noted.
B. There is Insufficient Documentation of the Findings Required by § 211.181.1
In her second point, mother complains that the juvenile court failed to comply with § 211.181.1.
Before placing B.T.O. with her relatives in this case, the juvenile court or "a public agency or institution designated by the court" had to conduct "an investigation of the home, relative or person and find[ ] such home, relative or person to be suitable...." § 211.181.1.
After reviewing the record submitted to us, we cannot determine whether such an investigation was conducted. By recommending that the juvenile court place B.T.O. with her grandparents, DFS implicitly found them to be suitable custodians. And by placing B.T.O. with her grandparents, the juvenile court also implicitly found them to be suitable custodians. But we cannot locate any evidence regarding the investigation upon which these implicit findings are based. Although the juvenile officer cites the DFS worker's "court report" as sufficient documentation, the "court report" merely acknowledges that B.T.O. is living with her grandparents and recommends that she remain with them. It does not indicate their suitability for placement.
Given the importance of placing B.T.O. in a suitable home, an investigation should be conducted and documented as required by § 211.181.1. Point II is granted. Accordingly, we reverse and remand the case so that the record regarding compliance with § 211.181.1 can be established.
C. The Juvenile Court Satisfied the Requirements of § 211.183.5
In her third and final point, mother complains that the juvenile court failed to comply with § 211.183.5.
Before removing B.T.O. from her mother and placing B.T.O. with her relatives, the juvenile court also had to issue a disposition order that complied with § 211.183.5. To comply, the court's order must:
(1) State whether removal of the child is necessary to protect the child and the reasons therefor;
(2) Describe the services available to the family before removal of the child, including in-home services;
(3) Describe the efforts made to provide those services relevant to the needs of the family before the removal of the child;
(4) State why efforts made to provide family services described did not prevent removal of the child; and
(5) State whether efforts made to prevent removal of the child were reasonable, based upon the needs of the family and child.
§ 211.183.5.
This requirement serves an important purpose:
The salutary purpose of the statute is to assure the trial court has focused upon the facts which must be established as a predicate to the drastic measure of removing the child from the care and custody of the natural parents, and, furthermore, to assure the reviewing court that all such facts have been closely considered.
*751 In re C.K.M.H., 829 S.W.2d 674, 675-76 (Mo.App. W.D.1992).
In this case, the court's amended judgment and disposition order complies with § 211.183.5(5) because it indicates that the "[e]fforts made to prevent the removal of the juvenile were reasonable based upon the needs of the family and juvenile." The disposition order likewise appears to comply with § 211.183.5(4) because it states that DFS made reasonable efforts to send B.T.O. home and then explains that the mother "refuses to seek drug or domestic violence counseling or any other services" from DFS.
But the disposition order itself does not set forth the remaining findings required by § 211.183.5. Instead, it incorporates by reference the court's previous ex parte order, which in turn incorporated by reference the DFS worker's affidavit of efforts. The affidavit satisfies all of the remaining elements of § 211.183.5. It states that removal is necessary to protect B.T.O. because mother "leaves her child w[ith] friends & family for extended periods without providing support for her care. [Mother] is actively using crystal meth & has no stable home for [B.T.O.]." § 211.183.5(1). It lists the services available to the family before removal: "Family Centered Services, case plan, Food Stamps, Temporary Assistance & Medicaid. HUD housing, energy assistance[,] Domestic Violence Shelters[,] Substance Abuse Treatment." § 211.183.5(2). It also describes the efforts made to provide those services relevant to the needs of the family before removal as follows: "Treatment planning, assistance with employment, HUD housing, Food Stamps, Temporary Assistance Medicaid." § 211.183.5(3).[5]
We disagree with mother that the manner in which the juvenile court incorporated these documents deprived her of an opportunity to challenge them. Although we acknowledge that mother did not have an opportunity to participate in the ex parte proceeding on January 16, 2002, the record reveals that mother was served with a copy of the ex parte order and attachments on January 20, 2002, well before the February 8, 2002, adjudication hearing. Furthermore, the DFS worker who authored the affidavit testified at the adjudication hearing. Mother could have cross-examined her at the adjudication hearing. Point III is denied.

IV. CONCLUSION
After reviewing the parties' briefs and the record on appeal, we affirm the juvenile court's adjudication of neglect. As to the disposition order, we affirm the juvenile court's findings under § 211.183.5. We reverse and remand the case for further proceedings to make the findings required by § 211.181.1.
PAUL M. SPINDEN, P.J., and PATRICIA A. BRECKENRIDGE, J., concur.
NOTES
[1] "Crank" is a common street name for methamphetamine.
[2] The juvenile court heard evidence that mother's live-in boyfriend said to mother, "[i]f you're going to let anybody eat [B.T.O.'s genitalia], why don't you let me do it?" Mother claims that her boyfriend made the remark in anger after mother refused to investigate an allegation that someone in Ms. Whitten's household had sexually abused B.T.O. The juvenile court did not cite this evidence as grounds for removing B.T.O. from mother's custody.
[3] Stepfather's wife confirmed that mother had told them that the car brakes had failed, although it is unclear from the wife's testimony when she did so.
[4] Unless otherwise indicated, all statutory references are to RSMo 2000.
[5] The affidavit also satisfies § 211.183.5(4) by indicating that the efforts made to provide services did not prevent removal because mother "has not had a job to be able to provide for her child. [Mother] is abusing crystal meth by admission to her stepfather."