841 S.W.2d 198 (1992)
In the Interest of J.K.C., Jr., (a minor) and T.F.C. (a minor).
John R. JOHNSTON, Chief Juvenile Officer, Respondent,
v.
J.K.C., Sr., and L.C.C., (Natural Parents), Appellants.
No. WD 45146.
Missouri Court of Appeals, Western District.
September 8, 1992.
Motion for Rehearing and/or Transfer Denied October 27, 1992.
Application to Transfer Denied December 18, 1992.
*199 Dean A. Davidson, St. Joseph, for appellants.
James A. Nadolski, St. Joseph, for respondent.
Barbara Braznell, St. Joseph, Guardian Ad Litem.
Before SHANGLER, P.J., and KENNEDY and SMART, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied October 27, 1992.
KENNEDY, Judge.
This is an appeal by James K.C. and Louise C.C. from a judgment terminating their parental rights to their children, James K.C., Jr. (Jimmy), born November 11, 1981, and Tina Faye C., born June 24, 1987. An earlier juvenile court order terminating the parents' parental rights to the children was reversed by this court because of ineffective assistance of counsel for the parents. In the Interest of J.C., 781 S.W.2d 226 (Mo.App.1989).
Termination of parental rights is to be ordered only upon "clear, cogent and convincing" evidence of a statutory ground for termination, Section 211.447.2, RSMo 1986.[1] Surely, no less exacting standard of proof could warrant the exercise of the solemn power permanently and irrevocably to terminate parental rights. The termination of parental rights is always and everywhere regarded as a drastic action, S.K.L. v. Smith, 480 S.W.2d 119, 123 (Mo.App.1972). Our standard of review is that of Rule 73.01, as interpreted by Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).
*200 With reference to each of the two children, the petition alleges two grounds for termination of parental rights. The first is that the child has been adjudicated to have been abused or neglected. Section 211.447.2(2).
The second ground was framed under the terms of Section 211.447.2(3). It was that the child had been under the jurisdiction of the juvenile court for a period of one year, and the conditions continue to persist which led to the assumption of jurisdiction, and there was little likelihood those conditions would be remedied at an early date so the child could be returned to the parent in the near future. The petition alleged the continuation of the parent-child relationship greatly diminished the child's prospects for early integration into a stable and permanent home.
Both statutory grounds require the court to consider and make findings with respect to any permanent and irreversible mental condition on the part of the parent "which renders the parent unable to knowing provide the child the necessary care, custody and control." Sections 211.447.2(2)(a) and 211.447.2(3)(c). The presence of such a mental condition does not furnish independent grounds for termination of parental rights, but is a factor for the court's consideration.
Both James C. and Louise C. are mildly mentally retarded. They have IQ's of 61 or 62. "Mild mental retardation" ranges from an IQ of 50 to 70. What this means in terms of actual limitations upon James's and Louise's abilities will be considered later in this opinion.
Jimmy was born November 11, 1981. At the time of the trial, (December, 1990 and January, 1991), he was nine years old. His history was as follows: He was removed from his parents' custody by order of the juvenile court on November 16, 1981, when he was five days old. He was first placed with a maternal aunt, but the maternal aunt became ill and he was placed in another foster home. On May 5, 1983, the child was returned to his parents and he remained with them, under DFS supervision, until he was five and one-half years old. On January 20, 1987, he was again taken from his parents by order of the juvenile court and placed in the custody of DFS, who placed him in a foster home. He has not resided in his parents' home since that time.
Tina Faye was born June 24, 1987. On the second day of her life, the juvenile court, because "the natural parents are incapable of properly parenting said child due to mental limitations," ordered her into the custody of the Division of Family Services. She was taken from the hospital of her birth and apparently has never seen the interior of her parents' home. She has been in foster care her whole life.
Although the cases are inevitably interrelated, this one case is actually four, with several common features. One case involves the parent-child relationship between James C. and Jimmy. A second case involves the parent-child relationship between Louise C. and Jimmy. A third case involves the parent-child relationship between James C. and Tina Faye C. A fourth case involves the parent-child relationship between Louise C. and Tina Faye C. The severance of one or more, but less than all, of those relationships does not necessarily call for the severance of any or all of the others. Each parent has parental rights with respect to each child, and each child has filial rights with respect to each parent. They may not be lumped together and disposed of wholesale with a single stroke. We will consider the four cases separately.

JAMES AND JIMMY
This case's magnetic center is the mental retardation of the two parents. The evidence clusters around that point. James C., as noted above, is "mildly mentally retarded." He was 52 years old at the time of the hearing. The fact of James's mental retardation, the testifying psychologists and psychiatrists agreed, does not ipso facto disqualify him as a parent.[2] Dr. Cox *201 gave the opinion that James would be unable to supervise Louise (his wife) and two children; that would be too much for him. Louise, according to the psychiatrists' testimony, is at the same time childlike and obstreperous, and taxes James's patience.
James himself testified at the hearing. His testimony was lucid, articulate and insightful. One would not suspect from reading his testimony he was of less than normal intelligence. The daily affairs of life he copes with adequately. He pays his bills, purchases household needs, has negotiated the purchase of a washer and dryer, and has had his residence repaired and improved. He can cook "some things." "I've got the Progressive Board coming in once a week. They ain't been out very long. My first dish was a oven-fried chicken, and the other one was a casserole, a tuna casserole, and the last one was a barbecued chicken." He can use the telephone. He can tell time. He travels by city bus and, even though he is unable to read, he knows which busses to ride. He knows directions. He appreciates the value of money, and Louise's extravagance is a source of distress to James and of dissension between Louise and himself. He has taken the initiative in learning to read. His tutor, the Reverend Mr. Lawson, a retired Methodist minister, testified James had faithfully attended weekly reading sessions, that he was cooperative and "very intense in trying to learn the material," and that he was making progress. James, during his testimony, demonstrated an elementary ability to read, then added: "That's what I have learned in the past eight weeks. There's no reason a retarded person can't learn." At one time he asked his DFS caseworker, Donna Blackman, about having a vasectomy. Whether he had the vasectomy the record does not show. His testimony articulated an understanding of child discipline, the need for education, child safety, and emergency measures. ("Well, first of all I'd dial 911 and call the ambulance right away.")
James's and Louise's income consists of social security disability checks. James testified he worked 12 years for a firm which was later sold and was no longer in operation. James and Louise live independently in their own house, which James had inherited from his father.
James and Louise, in September before the hearing, which began in late December, 1990, sought out the services of the Albany Regional Center. In cooperation with this organization, they have formulated and agreed upon a set of goals. With the help of the Albany Regional Center, they are working on a program of self improvement, including personal care, home care, money management, domestic skills and the like. The "Progressive Board," which James said had been teaching him to cook, is part of this program.
The Albany Regional Center approach, with its apparent progress, would indicate that a "social service plan entered into by the parent and the division," Section 211.447.2(3)(a), should not have been dispensed with. DFS's reason for not offering the parents a social service plan was their assumed inability to conform to it, and the fact the father could not read the plan. Louise, however, can read. James and Louise had supportive friendsin particular their pastor, the Reverend Mr. Groves and Mrs. Groveswho could have read and interpreted the plan to them. The assumed inability of the parents to conform to such a plan seems a feeble excuse for omitting it. The evidence reveals a number of instances where James complied with *202 DFS directions, in some cases showing some resourcefulness in doing so. There are no instances where he failed to conform. The parents argue on this appeal the absence of such a plan in itself is ground for reversal. They cite In re Interest of A.L.B., 743 S.W.2d 875, 881 (Mo.App. 1987), and G.L. By and Through Shull v. Zumwalt, 564 F.Supp. 1030 (W.D.Mo.1983). A social service plan is not mandatory in every case, and its absence is usually not in itself a ground for reversal. It is, however, a factor to be considered by the court in a parental rights termination case brought under Section 211.447.2(3)(a). In Re H.K., 762 S.W.2d 465, 469 (Mo.App.1988). Since we place our decision on other grounds, we need not further consider the effect of the absence of the social service plan.
Jimmy is a "moderately retarded" child, with an IQ of 40. "Moderate mental retardation" ranges from an IQ of 35 to 50. As earlier noted, Jimmy was removed from his parents' custody when he was five days old and returned to their custody at the age of one and one-half years. He remained in their custody until he was five and one-half years old, when he was removed the second time. He has been in one foster home or another since that time. At the time of the trial (December, 1990 and January, 1991), he was nine years old. He had been in school four years, where he was among severely handicapped children. The school program director testified Jimmy had made some progress in school, although in the fourth year he had regressed. The director noted the child had been in two foster homes during that year, which "always makes a change in a child's life," and that he was more nervous and high strung the day after his periodic visits with his natural parents. He has some language. He normally can follow directions.
The issue that precipitated Jimmy's second removal from his parents' custody at the age of five and one-half years was an abrupt regression by the youngster, as described by DFS worker Donna Blackman. Jimmy was attending Childrens' Rehab Unit. His attention span dropped. He became unresponsive. Whereas he had learned to put a six-piece puzzle together, he now suddenly lost that ability. Upon testing, he was found to be 17 months old mentally and developmentally. The DFS worker who testified to this sudden regression could not account for it. DFS sought to solve the problem by asking, and securing, the removal of the child from his parents' home to foster care. There is no evidence that Jimmy's regression was caused by any condition in the parents' home, or by any act of commission or omission of the parents, or by any inadequacy on their part. Neither was there any evidence Jimmy's removal from his parents' home brought on improvement. His progress, which had preceded the period of regression, took place also while he was in his parents' custody. His school program director at the time of the hearingwhen Jimmy was nine years old and had been in foster care four yearstestified to a recent period of regression, which could not be traced to the parents' fault, for Jimmy during that time was in foster care.
Section 211.447.3 lists, among other factors to be evaluated in a parental rights termination case, three closely related factors. One of the factors is "the [child's] emotional ties to the birth parent." Section 211.447.3(1). All the evidence, including the testimony of the DFS workers who have observed the interaction of parents and children during their visits, is that there are strong emotional ties between James and Jimmy. The parents brought small gifts to the children on their visits. DFS's Donna Blackman was asked whether, from her observation of the interaction of parents and children during their visits, there appeared to be the normal parent-child bonding. She answered: "I think the father and Jimmy are very close. I mean, you know, Jimmy seems to love his dad a lot. I don't see any bonding between the mother and the children at all." Donna Blackman once asked James C. why his head drooped and why he became quiet during the visits with his children. "I can tell you what he said ... He's depressed or sad because of his children, because he misses them. He loves them. He thinks they're beautiful kids. He's very proud of them." The Reverend Richard Groves was the James's and Louise's church pastor. *203 Testifying about James's solicitude for Jimmy, he said: "I can truly say absolutely that James loves his son as much as any man has ever loved his son." The Reverend Mr. Groves testified to James's having a chain link fence installed to prevent Jimmy's getting into the street when he was three or four years old, and to James's calling on Mr. Groves to transport Jimmy to the hospital on two occasions, once because of a lump on his head from a fall, and the other for an "evaluation." Mr. Groves further testified, "Everywhere that James went, James had Jimmy with him."
The emotional ties of parents and children are closely connected with two other factors the court is required to evaluate, namely, "[t]he extent to which the parent has maintained regular visitation or other contact with the child." Section 211.447.3(2); and "[t]he parent's disinterest in or lack of commitment to the child." Section 211.447.3(5). On these two factors, the testimony is clear the parents were always on hand for scheduled visits, and their interest and commitment to the children have been strong and unwavering. We note the absence in this case of the circumstances we so often see in termination of parental rights caseswillful neglect, abuse, selfish disinterest, criminal behavior, drug abuse or alcohol abuse, immorality of various kinds. We see instead the oppositeselfless devotion, unflagging interest in the children, moral behavior, a steadfastness in the pursuit of a reunification with their children which is all the more remarkable because of an unbroken succession of frustrations and defeats.
Several psychologists and psychiatrists testified to their opinions, based upon their examinations and upon reports furnished to them by DFS, with respect to James's and Louise's ability to "parent." James and Louise have submitted themselves to unending tests and evaluations. The sum and substance of the professionals' testimony was that James's and Louise's parenting skills were deficient, and could not be made sufficient. Dr. Cox said the supervision of Louise and two children would be "more than he could handle." Dr. Cannon testified: "[James] does not have the capacity to be the sole provider of a child ... [James's] limitations would adversely affect the child's care and stimulus, thus putting the child at a developmental and emotional risk ... My concern would be that the child would not achieve his or her highest degree of functioning, versus being in a very healthy, structured, stimulating environment."
Two unsupported assumptions underlie the professionals' opinion testimony. One is that Jimmy, if his sonship were terminated, would be placed in a "very healthy, structured, stimulating environment." That is a dubious proposition, unsupported by any evidence. In fact, the record is devoid of any evidence that severance of Jimmy's filial relationship would serve the statutory goal of enabling him to have a "permanent and stable home." Section 211.443(3). That goal is best served by preserving the parent-child relationship; there is no reason to doubt the permanency and stability of James's and Louise's home.
The second unsupported assumption is that parental rights may be terminated if the child would be "better off" in some hypothetical ideal environment. No parent has to defend his parental relationship against the claim his children would be "better off" in some ideal environment. See In Re Trapp, 593 S.W.2d 193, 206 (Mo. banc 1980); and S.K.L. v. Smith, 480 S.W.2d at 123.
The evidence shows earnest attempts on James's part to comply with DFS's requirements. The testimony of DFS worker Sandra Miller furnishes an example. James and Louise were expecting a baby in August, 1987, who turned out to be Tina Faye. The parents had made some plans for Tina's arrival, but she was born June 24, 1987, two months prematurely. Sandra Miller inspected the house where James and Louise lived. This was evidently a house on South 11th Street in St. Joseph (not the house where James and Louise lived at the time of the hearing). Sandra Miller found the house unsuitable for the baby's reception because of dirt and bugs. She told James this. James said he would go home and clean it up. Sandra Miller, as she drove by the C. house on that evening, saw James sweeping and cleaning. She never inspected the results of his labors, *204 however, for Tina was taken from her parents at the hospital and the condition of the C. home became moot.
A substratum of testimony related to the sanitary conditions of the house where James and Louise lived. The DFS workers observed unwashed dishes, insects, dirt and disorder, and also some episodes of head lice. Jimmy was observed in urine-soaked diapers. James and Louise lived during that period in a different house, perhaps more than one, than the house they owned and occupied at the time of the hearing. The testimony related to the period when Jimmy was an infant and a toddler. It does not have much relevance when the child reaches the age of nine years, and has passed the age of total dependency, as he had by the time of the second termination hearing. There is evidence in the record, also, that each time DFS called some undesirable condition to James's attention, he made an effort to correct it. James testified that the house where he and Louise now live was treated by an exterminator after they moved into it, three years before the hearing, and there were no roaches found in the house after the extermination treatment. DFS's Donna Blackman, who testified she had visited the present residence, testified only that it was small; she did not testify to any filthy conditions. (The house, according to the Reverend Mr. Grove's measurements, contained 730 square feet in its five rooms, including bathroom.) The house James and Louise lived in had been inherited by James from his father. James testified all the furniture in the house was new. The house has undergone fairly extensive repairs and improvements since they moved into it. Other improvements were in the offing. James had had the house treated by an exterminator and it was free of roaches.
The overwhelming weight of the evidence, by the criteria of Section 211.447.2, opposes the severance of the parent-child relationship between James and Jimmy. We reverse the judgment terminating James's parental rights to Jimmy.

LOUISE AND JIMMY
Louise is a different case. All the expert witnesses contrast James and Louise, although they are of equal IQ's. James is more mature and responsible. Dr. Rhunke described his testing of Louise: "At the time of the testing, [Louise] would not enter the testing situation without her husband. He essentially coaxed her and led her into the testing situation. She was not very cooperative during the testing and sometimes would not respond. He sort of begged, pleaded and cajoled and instructed her to answer and to be cooperative. And in general, he was kind of in charge of her functioning." Louise has a paranoid personality, but this is not a psychotic condition. At the time of Jimmy's birth in 1981, she was determined to be suffering from schizophrenia, a mental disorder. This condition did not show up upon later examinations. If Louise were the sole parent, we would have a different case. She and James are married and living together. There is bonding between her and Jimmy. James and Louise apparently have a stable home and marriage, although not without its turbulences. We have held there is no ground for terminating James's parental rights to Jimmy. There is no point, then, even if the evidence would justify it, in terminating Louise's parental rights to Jimmy, for she and James will, from aught that appears, continue to live together.
The termination of Louise's parental rights to Jimmy is reversed.

JAMES AND LOUISE AND TINA FAYE
We turn next to the parents' parental rights to Tina Faye. What the record tells us about Tina Faye is very little. She was never in her parents' custody outside the hospital where she was born. Having been born June 24, 1987, she was three years old at the time of the hearing. It was not known at the time of the hearing whether she was of normal intelligence. There is no bonding between Tina Faye and Louise, but there is some bonding between Tina Faye and James. James holds and hugs Tina Faye during their DFS arranged visits. That there is any bonding between even James and Tina Faye is surprising. As DFS worker Cathy Coy testified, "[Tina Faye] really didn't know who they were." *205 James's and Louise's main interest is in Jimmy during the DFS arranged visits. James during his testimony was asked: "Can you tell us why it is you do not want the Court to terminate your parental rights?" James answered, "Well, because I had bonding over Jimmy. I don't know the girl, I don't know about her, but she's never been put in the home. I wouldn't know how she'd feel."
Different considerations lead us to affirm the termination of parental rights both of James and Louise to Tina Faye. There has been no opportunity for bonding between the child and the parents. There is evidence (opinion of Dr. Cox, supra) James and Louise would find the care of two children, one of them only five years old, more than they could handle. The parents' interest in Tina Faye, compared to their interest in Jimmy, has been small. The prospect of a suitable adoptive home for Tina Faye at her age of five years seems more likely.
The order terminating the parental rights of James and Louise C. to Jimmy is reversed. The order terminating their parental rights to Tina Faye is affirmed.
All concur.
NOTES
[1] References to Section 211.447, et seq., will be to the statute as amended in 1985 unless otherwise indicated.
[2] See, Hayman, "Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent," 103 Harv.L.Rev. 1201, 1226: The central conclusion of this survey is that the label "mentally retarded" serves no useful purpose in child welfare adjudications. At least within the population of persons labeled "mildly" or "moderately" mentally retardedthe subjects of nearly every scientific study and nearly every judicial decision involving mentally retarded parentsmany "mentally retarded" parents are adequate or better parents, and with appropriate support, many more could be. The continued use of the "mentally retarded" label obscures this fact, thereby depriving the parent of a meaningful individualized adjudication and subjecting her instead to a stereotypical response that presumeswronglythat she is incapable of being a good parent. This is not to say, of course, that every "mentally retarded" parent is or will be a good parent. It is only that many are, and perhaps most could be, were it not for the "mentally retarded" label.