

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF J.B. | ) | |
| | ) | |
| JUVENILE OFFICER, | ) | |
| | ) | |
| Respondent, | ) | WD78428 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | October 6, 2015 |
| | ) | |
| W.B. (Father), | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable K. Elizabeth Davis, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Lisa White Hardwick and Anthony Rex Gabbert, Judges

W.B. (Father) appeals the juvenile court's judgment finding his son (Child) in need of the care and protection of the court. Father raises three claims on appeal: (1) there were insufficient facts pled in the petition to vest the juvenile court with jurisdiction over Child; (2) there was insufficient evidence presented at the adjudication hearing to support the juvenile court's exercise of jurisdiction over Child; and (3) the juvenile court failed to make sufficient findings in its judgment to support its exercise of jurisdiction over Child in that the findings did not establish

that removal of Child from Father's care was necessary. Because Father's second point has merit, we reverse the judgment of the juvenile court.

## Background

Child was born prematurely, after only 25 weeks of gestation. Because of Child's premature birth, he had many complications, requiring intensive medical care. Accordingly, Child remained hospitalized for fourteen weeks following his birth. As a result of his medical complications, Child will need numerous and frequent follow-up visits for occupational therapy, speech therapy, and physical therapy. The success of these additional therapies depends greatly on parental involvement at home.

Before Child was released from the hospital, the Clay County Juvenile Officer filed a petition for protective custody, alleging that "the parents or other persons legally responsible for the care and support of the child neglect or refuse to provide proper support, medical, surgical or other care necessary for his well being." The petition asserted that "[t]he parents, at the time of the expected discharge, have been unable to demonstrate sufficient competency necessary for the proper care of a child with extraordinary medical needs." It further alleged:

2. [Mother] has birthed other children who she does not prov[ide] care for; four of which the parental rights were terminated in New Mexico in April 2014 in an adversarial proceeding;

3. [Father] was involved with Child Protective Services in New Mexico. [Father] admits that [Father's] mother, [E.B.,] has been caring for his other three children since 2003 and he fails to provide for their care or support;

4. [Father] states he is receiving full disability due to mental health issues. He reports his mental health is untreated which results in his inability to provide safe care for the child on a continual basis;

5. Reasonable efforts have been made to prevent or eliminate the need for removal of [Child] from the home, or in the alternative and under the circumstances, reasonable efforts either would have been futile, or an emergency existed;

2

6. [Child] is in need of the care and protection of the Court.

The juvenile court thereafter entered an order for protective custody on the ground that "the parents fail to provide proper care, custody and control," and set the matter for a hearing.

At the adjudication hearing, the court received testimony from Dr. Okunola Oluola (Child's treating physician at Children's Mercy Hospital), Jennifer Wilson (a social worker for Children's Mercy Hospital), Mary Rogers (a registered nurse at Children's Mercy Hospital who worked with the family for one night during Child's fourteen-week stay), Rebecca Nunnelly (a registered nurse at Children's Mercy Hospital who worked with the family the first two days of Child's last five days in the hospital), Mother, and Father.

Dr. Oluola testified about the various complications, as well as treatments that Child required as a result of his premature birth. When asked about Mother and Father, Dr. Oluola testified that both parents were involved and ready to do what they could for Child.[1] Dr. Oluola had no negative impressions of the parents or their commitment to Child.

Wilson, the social worker, testified that Father had reported to her that he had been diagnosed with bi-polar disorder, but that he was not receiving treatment at that time. Wilson also testified that Father had reported a history of illegal drug usage, but claimed that he had been sober for the past year. Wilson testified that she had no reason to doubt Father's representation of sobriety. Wilson recalled a single incident where she asked the parents to be at the hospital to feed Child at 8:00 a.m., but Mother refused, indicating only that it was "too early for them," and that she would come before the 11:00 a.m. feeding. Wilson did not seek any further information from Mother and did not report talking to Father about the 8:00 a.m.

---

[1] Though Dr. Oluola also testified that he did not know how much the parents could do, he clarified that his comment was not an expression of doubt regarding the parents' capacity; rather, it was merely an expression of his own lack of knowledge regarding the parents' capabilities.

feedings. When asked about her interaction with the parents, Wilson indicated that the parents were appropriate, cooperative, and appreciative of services offered. She also testified that, in response to directions from Children's Division, the parents had secured housing. Wilson had no doubts about the parents' commitment to Child.

Nurse Rogers recalled one instance where Father unintentionally nodded off at Child's bedside, which was a violation of Children's Mercy Hospital rules. After she woke him up and explained the rules, Father apologized, and Nurse Rogers never saw him drift off again. Rogers also recalled an incident wherein Mother had trouble assembling the bottle for feeding, but Father showed Mother how to do so, and Father then fed Child. Rogers testified that Father performed most of the care—feeding Child, changing clothes, changing diapers, etc.—while Mother simply observed. Rogers believed that Father was committed to Child.

Nurse Nunnelly testified that, before children are released from Children's Mercy, families are given care instructions and then placed in a special environment where the families perform the care, but Children's Mercy staff can observe them to ensure the care is proper. Nunnelly worked with the family the day before the observation period began, as well as the first day of observation. During that time, Nunnelly had to remind the parents to change Child's diaper once and check Child's temperature; she observed one time when Child's hat was left off, causing Child to become hypothermic and requiring intervention to warm him back up. Nunnelly also testified that Mother had trouble measuring Child's medication.

Mother offered no evidence; in response to every question, she advised the court that she was "plead[ing] the 5th."

Father testified that he was receiving Social Security Income for mental health issues, though he was unsure of their nature. Father indicated that he was not then receiving treatment,

4

though he had received counseling and medication in the past. Father testified that his mental health issues did not, in any way, limit his ability to complete basic daily tasks, such as driving, grocery shopping, paying bills, or performing domestic chores.[2] Father acknowledged that he had three other children that he voluntarily placed in the guardianship of his mother, sister, and brother-in-law. Father testified that the guardianship was his own choice and he felt that it was best for his children because he was in a "rocky" marriage at the time.[3] Father testified that his other children were doing "wonderful," and he did not think it would be good to move them from their home in New Mexico to Missouri with him. Father testified that he loves Child and is committed to him. In an effort to understand Child's medical needs, Father has been reading books on preemies and their associated disabilities, inquiring of family members as to how to find resources, and questioning medical staff about subjects he does not understand. Father also enrolled in Parents as Teachers, which he participates in once per week and learns about different developmental stages and how to interact with a child. Father visits Child once per week for two hours at a time, and the visits have been going well. Father indicated that, if someone gave him a lesson or suggestion about Child's needs, he would follow it.

After receiving this evidence, the juvenile court stated: "I'm going to find that the child is in the need of care of the Court and put the child under the jurisdiction of the Court due to the child's needs and the parent[s'] inability at this time to care for the minor child."[4] The court then moved on to the dispositional phase of the hearing.

---

[2] Father could not, however, explain why he was not working.

[3] The record does not reflect Father's marital status at the time of the hearing. Father and Mother were not married, as Mother was still married to another man at the time.

[4] The court later elaborated:

[A]t this time I don't feel like they can meet their child's reasonable needs. I need for your clients, in particular dad, to—I don't know if he's taken the mental health evaluation nobody's given me one. I assume that it's not back. He needs to get treatment for whatever mental health issues he has. So, you know it's complicated by the fact that the child hasn't been out of the hospital that

5

Counsel for the Juvenile Officer then offered the following exhibits: Exhibit 3 (Report of Social Services); Exhibit 4 (Social Investigation Report); Exhibit 5 (proposed Form 14); Exhibit 6 (Report of the Department of Social Services); and Exhibit 7 (written report of the court-appointed special advocate). The court received the exhibits without objection. The court then indicated:

> I'm telling you what I want these parents to do before I modify it and let the baby go home. They need some more parenting classes; dad needs to have a psych evaluation; mom needs a psych evaluation and they need to be compliant with whatever that psych evaluation asks for.

The court further indicated that the Parents as Teachers classes, alone, were insufficient; the court wanted the parents to "take advantage of whatever they can get." Father appeals.

## Standard of Review

"'Review of juvenile proceedings is analogous to review of court-tried cases.'" *B.T.O. v. M.O.*, 91 S.W.3d 745, 748 (Mo. App. W.D. 2002) (quoting *In re T.B.*, 936 S.W.2d 913, 914 (Mo. App. W.D. 1997)). "Accordingly, we will disturb the juvenile court's order only if there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We defer to the juvenile court on issues of fact and witness credibility." *Id.* "When reviewing the sufficiency of the evidence, we view the facts presented in evidence and the reasonable inferences therefrom in the light most favorable to the juvenile court's judgment." *Id.*

## Analysis

Father raises three points on appeal. First, he argues that the petition failed to allege sufficient facts to bring Child within the juvenile court's jurisdiction. Second, he argues that the Juvenile Officer failed to clearly and convincingly prove at the adjudication hearing that Father

---

long but at this time I feel like the child—they cannot adequately care for this child at this point and we're going to offer them services to try to get them to the position that they can.

neglected or refused to provide proper support, education, medical, surgical, or other necessary care for Child. Finally, he argues that the juvenile court erred in retaining jurisdiction because the adjudication order failed to make sufficient findings to support the juvenile court's exercise of jurisdiction over Child; specifically, the court failed to make any findings that removal was necessary and failed to identify the evidence upon which the findings rested.

## A. Sufficiency of the Petition

Father's first point on appeal argues that the petition pled insufficient facts to bring Child within the juvenile court's jurisdiction in that the petition "failed to set forth specific instances in which [Father] or [Mother] neglected or refused to provide proper care for the Child or how the Child was otherwise without proper care, custody or support."

Section 211.091.2 provides, in pertinent part, that "The petition shall set forth plainly: (1) The facts which bring the child . . . within the jurisdiction of the court; . . . and (5) Any other pertinent data or information." A child falls within the exclusive jurisdiction of the juvenile court if it is alleged that the child is "in need of care and treatment because: (a) The parents . . . neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being . . . ; [or that] (b) The child . . . is otherwise without proper care, custody or support." § 211.031.1(1)(a), (b).

The Missouri Supreme Court considered a challenge to the sufficiency of a juvenile court petition in *In the Matter of Trapp*, 593 S.W.2d 193 (Mo. banc 1980). There, the Court held that "a neglect petition couched in the language of the statute defining the juvenile court's jurisdiction is adequate to vest the court with jurisdiction to enter custody orders." *Id*. at 199.

Following *Trapp*, several appellate court cases found petitions to be insufficient—despite their recitation of the statutory language—for the same reasons Father argues here: they failed to

7

identify specific acts or omissions of the parents, constituting neglect. *See, e.g., M.R.H. v. McElroth*, 622 S.W.2d 15, 17 (Mo. App. E.D. 1981) (holding petition insufficient where it failed to allege that the child's medical condition "arose due to the mother's neglect or that it could have been corrected if the mother had taken appropriate measures"); *In the Interest of C.J.A.A.*, 674 S.W.2d 266 (Mo. App. W.D. 1984) (holding petition insufficient where it merely parroted statutory language without specifying any act by the father); *In the Interest of D.J.B.*, 718 S.W.2d 132, 134 (Mo. App. S.D. 1986) (holding petition to be insufficient where it alleged that the child had been neglected, but failed both to specify by whom and to identify any acts or omissions of the mother); *In the Interest of C.T.*, 942 S.W.2d 467 (Mo. App. S.D. 1997) (holding petition insufficient where it merely parroted the statutory language and failed to cite specific acts of neglect by the mother).

Though § 211.091.2 does not require that specific instances of neglect be pled, Rule 113.01, which was adopted after the *Trapp* decision, does. Under Rule 113.01(b)(3), a petition "shall set forth plainly, concisely, and with reasonable particularity . . . the facts that bring the juvenile within the jurisdiction of the court, including the date, place and manner of the acts alleged, and the law or standard of conduct, if any, allegedly violated by the acts."

This court addressed the apparent conflict between *Trapp* and the subsequent appellate decisions in *In re A.A.R.*, 71 S.W.3d 626 (Mo. App. W.D. 2002). "Because the only change since *Trapp* [wa]s the adoption by the Supreme Court of Rule 114.01 [the precursor to Rule 113.01], it would be easy to assume . . . that the . . . cases decided after *Trapp* hold that a failure to comply with the more stringent pleading requirements . . . deprives the juvenile court of jurisdiction." *Id.* at 633. But none of the other decisions relied on noncompliance with Rule 113.01 in holding that the court lacked jurisdiction. *Id.* at 634. And such a determination

8

tended to conflict with a later decision of this court, wherein it was held that "so long as the neglect petition indicated that the child was neglected and in need of care, and the parents were not providing that care, the petition was sufficient to vest the juvenile court with jurisdiction." *Id.* at 635 (citing *In the Interest of D.L.D.*, 701 S.W.2d 152, 158 (Mo. App. W.D. 1985)). "The petition's failure to comply with the pleading requirements of Rule 114.01 did not negate this jurisdiction." *Id.* This court noted that "[i]f the Rule, in fact, imposes the minimum pleading requirements to vest jurisdiction, the consequence would be that any petition without this specificity does not plead sufficient facts to vest jurisdiction." *Id.* On the other hand, "[i]f the Rule intends to establish pleading requirements that are not jurisdictional, the failure to comply would make the petition vulnerable to a motion . . . for [more] definite pleading under Rule 55.27(d), or a motion to dismiss for failure to state a cause of action." *Id.* "Those deficiencies in the pleading[, however,] are not jurisdictional . . . and are waived if not raised." *Id.*

This court then examined whether the pleading requirements of Rule 113.01 were meant to be jurisdictional and concluded that "[t]here is nothing in [the Rule] to suggest that the pleading requirements of that Rule were intended by the Supreme Court to impose a 'condition precedent' to the court acquiring subject matter jurisdiction over a juvenile case." *Id.* at 636. In fact, the comment to the Rule suggested that the Supreme Court's purpose in adopting it was "to specify, more clearly than in § 211.091.3, 'the facts that bring the juvenile within the jurisdiction of the court.'" *Id.* (quoting Comment to former Rule 114.01, which was recodified as Rule 113.01, effective Jan. 1, 2010). Accordingly, this court determined that, "a petition which complies with § 211.091, but does not comply with the pleading requirements of [the Rule],

9

would be subject to challenge as erroneous on direct appeal, but not void for lack of jurisdiction and subject to collateral attack." *Id*.

Here, Father raised no challenge below to the sufficiency of the petition under either the statute or the Rule. We need not decide, however, whether his failure to raise this challenge below affects his claim on appeal, as the petition is sufficient under both authorities. The petition parrots the statutory language in alleging that Child "is in need of the care and protection of the Court, in that the parents or other persons legally responsible for the care and support of the child neglect or refuse to provide proper support, medical, surgical or other care necessary for his well-being." The petition further alleges that "[t]he parents, at the time of the expected discharge, have been unable to demonstrate sufficient competency necessary for the proper care of a child with extraordinary medical needs." Thus, it is sufficient under the test laid out in *Trapp*. Though the petition does not cite specific acts or omissions of either Mother or Father demonstrating neglect as required by Rule 113.01, the petition does allege that Father admitted having an untreated mental health issue, "which results in his inability to provide safe care for the child on a continual basis." Though this allegation is not a specific act of neglect, it does suggest that Father admitted an inability to provide safe care for Child. Under either the statute or the Rule, that allegation, coupled with the statutory language was sufficient to bring Child within the juvenile court's jurisdiction.

Point I is denied.

**B. Sufficiency of the Evidence**

In his second point on appeal, Father argues that the evidence presented at the adjudication hearing was insufficient to establish that Father neglected Child or refused to provide proper support, education, medical, surgical or other necessary care, or that Child was

otherwise without necessary care, custody and support. The Juvenile Office argues that "[t]he testimony presented shows that [Father] has been unable or unwilling to care for his own health (his mental illness), has not been able to care for his other minor children, and the medical testimony raises concerns about his ability to care for [Child]."

"The purpose of the adjudication hearing is for the juvenile court to determine whether there exists sufficient evidence that the court should assume jurisdiction over the child." *K.S.W. v. C.P.S.*, 454 S.W.3d 422, 426 (Mo. App. W.D. 2015). To make this determination, the juvenile court "receives evidence on the allegations that have not been admitted." *Id*. "When a petition alleges that a child is in need of care and protection as the basis for jurisdiction, the standard of proof is clear and convincing evidence." *In re G.F.M.*, 169 S.W.3d 109, 111 (Mo. App. W.D. 2005). The burden of establishing clear and convincing evidence is on the Juvenile Office. *In Interest of A.L.W.*, 773 S.W.2d 129, 131 (Mo. App. W.D. 1989) ("The proponent of a neglect petition bears the burden to prove the constituents of the cause of action by clear and convincing evidence.").

The evidence at the adjudication hearing demonstrated that Child had several medical complications resulting from premature birth. There was no evidence, however, that his premature birth was the result of any neglect on the part of either Mother or Father. The evidence also demonstrated that Child would have above-average medical needs resulting from the premature-birth-related complications. The petition alleged that neither Mother nor Father had sufficient competency to properly care for a child with extraordinary medical needs. The Juvenile Office, however, failed to prove this allegation.

Though the evidence demonstrated that Father admitted to having mental health issues and that he was not undergoing treatment for the issues, the exact nature of his illness was not

11

established, nor was the presumed need for treatment. Section 211.031.5 states that "[t]he disability or disease of a parent shall not constitute a basis for a determination that a child is a child in need of care or for the removal of custody of a child from the parent *without a specific showing that there is a causal relation between the disability or disease and harm to the child*." (Emphasis added.) Despite the allegation in the petition, there was no evidence presented even suggesting that Father's mental illness hampered his ability to parent Child. And contrary to Father's alleged admission identified in the petition, Father testified that his mental health issues did not impede his abilities in any way. Though Father responded that he didn't know when asked why he was not working if his mental health issues were not a problem, this evidence does not establish that Father was unable to properly care for Child or that his mental health issues interfered in his ability to parent. At most, it established either that Father was unable to work or that Father may have been receiving benefits in error. But neither of those facts suggests that Father is incapable of parenting Child.

As for Father's other minor children, the evidence did not support the Juvenile Officer's assertion that Father was *unable* to provide them care. On the contrary, the undisputed evidence showed that Father voluntarily placed his other children with his own mother because he believed it to be a better environment than staying with him during an admittedly "rocky" marriage. And though the court did not have to believe Father's evidence, the Juvenile Office presented no evidence demonstrating that Father was unable to care for his other children. It merely proved that they were not in his care, but it failed to prove why. As it was the Juvenile Office's burden to prove neglect, its failure to present this kind of evidence left the court with nothing to rely upon in rendering its judgment that Father was incapable of providing the necessary care for Child.

As for Child's medical issues, there was no evidence presented that Father would be unable to appropriately respond to those issues. The evidence showed that Child would need numerous medical visits; the evidence also showed, however, that Father had a driver's license, a vehicle, and the ability to drive. Father testified that, if he was given a suggestion or direction pertaining to Child's care, he would follow it. Again, though the court did not have to believe Father, there was no evidence suggesting an inability to provide appropriate care. All of the witnesses believed that Father was committed to Child, and by all accounts, Father was actively involved in learning about Child's issues and how to handle them.

An additional matter was raised at the hearing—that Father admitted a history of illegal drug usage. But past drug usage, alone, does not demonstrate that Father would be unable to care for Child. *See In the Interest of G.C.*, 50 S.W.3d 408, 412 (Mo. App. E.D. 2001) (holding that the mother's admitted past drug usage was insufficient to demonstrate an inability to care for the child where there was no evidence of current drug usage, criminal convictions, or inability to care for child as a result of drug usage).

We recognize that "[a] pattern of neglect is not necessary for a court to assert jurisdiction." *Id*. at 411. "The juvenile court does not have to find that a dangerous situation exists, but only that there has been a failure to supply the child with the minimum quality of care that the *community* will tolerate." *Id*. "When faced with a potentially harmful situation, the juvenile court need not wait until harm is done before it can act." *Id*. "Rather, the court is authorized to act to prevent the deterioration of a child's situation[,]" because, "[a]t the risk of being wrong, we are required to protect innocent children who cannot care for themselves." *Id*. That being said, however, "[n]o parent has to defend his parental relationship against the claim

his children would be 'better off' in some ideal environment." *In the Interest of J.K.C.*, 841 S.W.2d 198, 203 (Mo. App. W.D. 1992).

Here, though we understand the court's hesitation to release Child to Mother and Father, especially in light of some of the evidence pertaining to Mother, the evidence pertaining to Father was simply insufficient to establish that any of his past or current issues interfered with his ability to parent Child. The sum total of evidence against Father was that he nodded off once at his infant's bedside, that he had a history of illegal drug use, that he had an untreated mental health issue of unknown nature or severity, and that either he or Mother had left Child's hat off one time in the hospital. But we can hardly fault a new parent for nodding off at an infant's bedside on one occasion, and Father was forthright and open about his drug history and mental illness. Regarding his drug history, there was no evidence indicating that he is currently abusing drugs, and the nurse to whom he revealed the information had no doubts about his representation of sobriety. And the mere fact that Father has a mental illness does not preclude him from being an adequate parent; for mental illness to provide a basis to bring Child within the jurisdiction of the juvenile court, the Juvenile Office had to prove that "there is a causal relation between the disability or disease and harm to the child." § 211.031.5. The Juvenile Office made no effort to prove any link between Father's mental illness and his fitness as a parent.

Furthermore, the court needed to view the evidence as to Mother and Father independently and not consider evidence against Mother as detrimental to Father. "Each parent has parental rights with respect to each child, and each child has filial rights with respect to each parent." *J.K.C.*, 841 S.W.2d at 200. "They may not be lumped together and disposed of wholesale with a single stroke." *Id.* Each relationship should be considered separately. *Id.* Accordingly, even though the evidence of Mother's fitness as a parent was more supportive of

14

the judgment,[5] the evidence was simply insufficient as to Father. *See id.* at 204 (noting that, "[i]f [the mother] were the sole parent, we would have a different case," but because the parents had a stable home together and because there was no ground for terminating the father's parental rights, "[t]here is no point, then, even if the evidence would justify it, in terminating [the mother's] parental rights").

Point II is granted. In light of this determination, we need not reach Father's Point III.

**Conclusion**

The evidence was insufficient to prove that Father neglected or refused to provide the necessary care for Child's well-being or that Child was otherwise without proper care and support. Accordingly, the juvenile court's exercise of jurisdiction over Child was improper. Its decision is reversed.

_____
Karen King Mitchell, Presiding Judge

Lisa White Hardwick and Anthony Rex Gabbert, Judges, concur.

---

[5] The evidence demonstrated that Mother had difficulty performing cares (i.e., feeding, changing, bathing, etc.) for Child and that she refused to be present for an early morning feeding simply because "it was too early."

15